**Parastoo FATIN, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 92–3346.

United States Court of Appeals, Third Circuit.

Argued May 21, 1993.

Decided Dec. 20, 1993.

Lawrence H. Rudnick (argued), Christina Aborlleile, Steel & Rudnick, Philadelphia, PA, for petitioner.

Stuart M. Gerson, Carl H. McIntyre, Jr. (argued), Carl W. Hampe, Lauri Steven Filppu, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for respondent.

Nancy Kelly, Deborah E. Anker, John Willshire–Carrera, Chin–Chin Yeh, Cambridge, MA, Gail Pendleton, Boston, MA, for amici curiae.

Before: STAPLETON and ALITO, Circuit Judges, and POLLAK, District Judge *.

## OPINION OF THE COURT

ALITO, Circuit Judge:

Parastoo Fatin has petitioned for review of an order of the Board of Immigration Appeals (the "Board" or "BIA") requiring her to depart or be deported from the United States. Arguing that she has a well-founded fear of persecution and that she is likely to be persecuted if she returns to her native country of Iran, the petitioner contends that the Board erred in holding that she is not entitled to asylum, withholding of deportation, or suspension of deportation. Based on the administrative record before us, however, we are constrained to deny the petition for review.

### I.

The petitioner is a native and citizen of Iran. On December 31, 1978, approximately two weeks before the Shah left Iran, the petitioner entered the United States as a nonimmigrant student. She was then 18 years old. She attended high school in Phila-

delphia through May 1979, and the following September she enrolled in Spring Garden College, also in Philadelphia.

In May 1984, apparently while still attending college, she applied to the Immigration and Naturalization Service District Director for political asylum pursuant to Section 208(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a) (1988), by submitting a completed INS Form I 589. In response to question 31 on this form, which asked what she thought would happen to her if she returned to Iran, she wrote: "I would be interrogated, and I would be forced to attend religious sessions against my will, and I would be publicly admonished and even jailed." In answer to question 34, which asked about any organization in Iran to which she or any immediate family member had ever belonged, she wrote:

> I personally belonged to a student group that favored the Shah. We refused to demonstrate with the students who favored Khomeni. I refused to wear a veil which was a sign or badge that I favor Khomeni. My cousin ... is now a refugee living in Paris France. He was formerly one of the guards for the Shah.

In response to question 37, which asked whether she claimed that conditions in Iran affected her freedom more than that of the rest of the population, she answered: "The present Iranian Government now looks with greater suspicion at famil[ies] having education and some wealth." Finally, in answer to question 38, which inquired about mistreatment of family members, she stated that her father, a physician, had been harassed by "religious fanatics," but that the harassment had stopped after war broke out between Iran and Iraq and doctors were desperately needed. She also stated that two of her cousins had been jailed for about one year.

After receiving an advisory opinion from the Department of State that the petitioner had failed to establish a well-founded fear of persecution, the INS District Director denied her application in January 1986. The INS

---

* Hon. Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

then commenced a deportation proceeding against her in February 1986. In its order to show cause and notice of hearing, the INS alleged that she had stopped attending college and was therefore deportable under what was then Section 241(a)(9) of the INA, 8 U.S.C. § 1251(a)(9) (1970),[1] since she was not in compliance with the conditions of her admission as a nonimmigrant. At a hearing in May of that year, she conceded deportability, but she renewed her application for asylum and also applied for withholding of deportation under Section 243(h)(1) of the INA, 8 U.S.C. § 1253(h)(1) (1988).

At a later hearing in May 1987, she advised the immigration judge that she also wished to apply for suspension of deportation under Section 244(a)(1) of the INA, 8 U.S.C. § 1254(a)(1) (1988). In addition, she testified in support of all of her claims for relief. She reiterated and expanded upon the statements in her initial asylum application concerning the treatment of her relatives in Iran, adding that one of her cousins had subsequently been killed in a demonstration and that her brother was in hiding in order to avoid the draft. She also elaborated upon her political activities prior to coming to the United States, stating that she had been involved with a student political group and with a women's rights group associated with the Shah's sister.

When her attorney asked her why she feared going back to Iran, she responded: "Because of the government that is ruling the country. It is a strange government to me. It has different rules and regulation[s] th[a]n I have been used to." App. 49. She stated that "anybody who [had] been a Moslem" was required "to practice that religion" or "be punished in public or be jailed," and she added that she had been "raised in a way that you don't have to practice if you don't want to." *Id.* She subsequently stated that she would be required "to do things that [she] never had to do," such as wear a veil. *Id.* at 55. When asked by her attorney whether she would wear a veil, she replied:

A. I would have to, sir.

Q. And if you didn't?

A. I would be jailed or punished in public. Public mean by whipped or thrown stones and I would be going back to barbaric years.

*Id.* at 56. Later, when the immigration judge asked her whether she would wear a veil or submit to arrest and punishment, she stated:

If I go back, I would try personally to avoid it as much as I could do.... I will start trying to avoid it as much as I could.

*Id.* at 68.

The petitioner also testified that she considered herself a "feminist" and explained:

As a feminist I mean that I believe in equal rights for women. I believe a woman as a human being can do and should be able to do what they want to do. And over there in ... Iran at the time being a woman is a second class citizen, doesn't have any right to herself....

*Id.* at 73–74.

After the hearing, the immigration judge denied the petitioner's applications for withholding of deportation, asylum, and suspension of deportation. Addressing her request for withholding of deportation, the immigration judge stated that, although she would be subject to the same discriminatory treatment as all other women in Iran, there was "no indication that there is a likelihood that the Iranian government would be particularly interested in this individual and that they would persecute her." App. 17. Similarly, with respect to her renewed request for asylum, the judge stated:

Respondent has offered no objective indic[i]a which would lead the Court to believe that there is a possibility that she would be persecuted upon return to Iran. Respondent has not been political[ly] active in the United States nor openly opposed to the Khomeni Government. It would appear that her fear of return to Iran while indeed understandable is based upon uncertainty and the unknown. In addition, it would appear that the respondent's fear upon return to Iran is her apparent dislike for the system and her belief that she as a woman would be subject to the severe

---

1. This provision now appears at 8 U.S.C. § 1251(a)(1)(C)(i) (Supp.1993).

restrictions presently imparted on Irani-an[s] in that country. Respondent there-fore contends that her beliefs as a "femi-nist" would be compromised. While the Court is very much sympathetic to the respondent's desire not to return to Iran, nonetheless, in applying the law to include case law, the Court is compelled to find that the respondent has failed to sustain her burden of proof necessary to be ac-corded asylum in the United States.

*Id.* at 18. Finally, the immigration judge held that the petitioner's "lack of desire" to return to Iran and "her fear of the uncertain-ties" involved were not enough to establish the "extreme hardship" needed for suspen-sion of deportation. *Id.* at 19.

Petitioner then appealed to the Board of Immigration Appeals. In her brief, she ar-gued that she feared persecution "on account of her membership of a particular social group, and on the basis of her political opin-ion." Petitioner's BIA Brief at 7. Her brief identified her "particular social group" as "the social group of the upper class of Irani-an women who supported the Shah of Iran, a group of educated Westernized free-thinking individuals." *Id.* at 8. Her brief also stated that she had a "deep[ly] rooted belief in feminism" and in "equal rights for women, and the right to free choice of any expression and development of abilities, in the fields of education, work, home and family, and all other arenas of development." *Id.* at 4. In addition, her brief observed that she would be forced upon return to Iran "to practice the Moslem religion." *Id.* at 8. Her brief stated that "she would try to avoid practicing a religion as much as she could." *Id.* Her brief added that she had "the personal desire to avoid as much practice as she could," but that she feared that "through religious igno-rance and inexperience she would be unable to play the role of a religious Shi'ite woman." *Id.* Her brief contained one passage con-cerning the requirement that women in Iran wear a veil in public:

In April 1983, the government adopted a law imposing one year's imprisonment on any women caught in public without the traditional Islamic veil, the Chador. How-ever, from reports, it is clear that in many instances the revolutionary guards ... take the law into their own hands and abuse the transgressing women....

*Id.* at 3–4. Her brief did not discuss the question whether she would comply with the law regarding the wearing of a chador. Nor did her brief explain what effect submitting to that requirement would have upon her.

In the section of her brief devoted to politi-cal opinion (*id.* at 8–13), she mentioned her political activities while in Iran, as well as her current "deep-rooted beliefs in freedom of choice, freedom of expression [and] equali-ty of opportunity for both sexes." *Id.* at 9.

The Board of Immigration Appeals dis-missed the petitioner's appeal. The Board noted that she had argued that she was entitled to relief "as a member of the social group composed of upper-class Iranian wom-en" and as a person who "was educated in the western tradition." App. at 11. Reject-ing this argument, the Board stated that there was no evidence that she would be "singled out" for persecution. *Id.* Instead, the Board observed that she would be "sub-ject to the same restrictions and require-ments" as the rest of the population. *Id.* The Board also noted that there had been "a considerable passage of time since [she] was in high school and participated in political activities." *Id.* at 12. In addition, the Board stated that her claims were based on circum-stances that had arisen since her entry into this country and that "[s]uch claims are dim-ly viewed." *Id.*

After the Board issued its order requiring her voluntary departure or deportation, the petitioner filed the current petition for re-view.[2]

---

**2.** Petitioner requested that we defer reaching a decision in this case pending review by the BIA of her motion to reopen or reconsider, which she filed one week prior to the petition now before us. The BIA denied that motion on December

31, 1992, and a petition for review of that denial has not been filed. Accordingly, the petitioner's request to postpone our decision in this case is now moot.

## II.

A.  We will first address the petitioner's argument that she is entitled to withholding of deportation pursuant to Section 243(h)(1) of the INA, 8 U.S.C. § 1253(h)(1) (1988), and that she is eligible for asylum under Section 208(a) of the INA, 8 U.S.C. § 1158(a) (Supp. 1993).

■  The provision governing the withholding of deportation, Section 243(h)(1), states, with one exception not relevant here, that

[t]he Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

Under this provision, an alien must establish a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 430, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984).  If an alien establishes that he or she meets the criteria set out in this provision, the Attorney General may not deport or return the alien. *See, e.g., Sale v. Haitian Centers Council, Inc.*, — U.S. —, —, 113 S.Ct. 2549, 2553, 125 L.Ed.2d 128 (1993).

■  The asylum provision applicable in this case, Section 208(a), is worded similarly but differs in several important respects. This provision states that "an alien physically present in the United States or at a land border or port of entry ... may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) (1988) of this title." The term "refugee" is defined in 8 U.S.C. § 1101(a)(42)(A) (1988) to mean, among other things, an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  An alien seeking asylum need not establish a "clear probability of persecution" but rather only a "well-founded fear of persecution." *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 428, 107 S.Ct. 1207, 1211, 94 L.Ed.2d 434 (1987).  But even if an alien meets all of the statutory criteria, the alien is not necessarily entitled to asylum.  Instead, the Attorney General has the discretion to grant asylum but is not required to do so. *See Haitian Centers Council*, — U.S. at —, 113 S.Ct. at 2593; *Cardoza–Fonseca*, 480 U.S. at 428 n. 5, 107 S.Ct. at 1211 n. 5.[3]

The petitioner in this case contends that she is entitled to withholding of deportation and is eligible for asylum based on her "membership in a particular social group" and based on her "political opinion."  We will discuss each of these grounds separately.

B.  Both courts[4] and commentators[5] have struggled to define "particular social group." Read in its broadest literal sense, the phrase is almost completely open-ended.  Virtually any set including more than one person could be described as a "particular social group." Thus, the statutory language standing alone is not very instructive.

3.  The procedures to be used in considering applications for asylum and withholding of deportation are set out by regulation. *See* 8 C.F.R. § 208 (1993).

4.  *See Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991); *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1575–77 (9th Cir.1986); *Ananeh–Firempong v. INS*, 766 F.2d 621, 626 (1st Cir.1985).

5.  *See, e.g.,* Guy S. Goodwin–Gill, *The Refugee in International Law* 29–31 (1983); 1 Atle Grahl–Madsen, *The Status of Refugees in International Law* 219–20 (1966); Maureen Graves, *From Definition to Exploration: Social Groups and Political Asylum Eligibility*, 26 San Diego L.Rev. 740 (1989); Arthur C. Helton, *Persecution on Account of Membership in a Social Group as a Basis for Refugee Status*, 15 Colum.Hum.Rts.L.Rev. 39 (1983); Daniel Compton, Comment, *Asylum for Persecuted Social Groups: A Closed Door Left Slightly Ajar—Sanchez–Trujillo v. INS*, 801 F.2d 1571 (9th Cir.1986), 62 Wash.L.Rev. 913 (1987); David L. Neal, Note, *Women as a Social Group: Recognizing Sex–Based Persecution as Grounds for Asylum*, 20 Colum.Hum.Rts.L.Rev. 203 (1988); T. David Parish, Note, *Membership in a Particular Social Group Under the Refugee Act of 1980: Social Identity and the Legal Concept of the Refugee*, 92 Colum.L.Rev. 923, 944–53 (1992); *see also* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* § 77 (1979).

Nor is there any clear evidence of legislative intent. The phrase "particular social group" was first placed in the INA when Congress enacted the Refugee Act of 1980. Pub.L. No. 96–212, 94. Stat. 102 (1980).[6] While the legislative history of this act does not reveal what, if any, specific meaning the members of Congress attached to the phrase "particular social group," the legislative history does make clear that Congress intended "to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968." *Cardoza–Fonseca,* 480 U.S. at 436–37, 107 S.Ct. at 1215–16. It is therefore appropriate to consider what the phrase "particular social group" was understood to mean under the Protocol. *See id.*

Article I of the Protocol generally adopted the definition of a "refugee" contained in Article I of United Nations Convention Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6259, 6261, 189 U.N.T.S. 150. This latter provision defined a "refugee" using terms—i.e., "race, religion, nationality, membership of a particular social group or political opinion"—virtually identical to those now incorporated in the INA.[7] When the Conference of Plenipotentiaries was considering the Convention in 1951, the phrase "membership of a particular social group" was added to this definition as an "afterthought."[8] The Swedish representative proposed this language, explaining only that it was needed because "experience had shown that certain refugees had been persecuted because they belonged to particular social groups," and the proposal was adopted. Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Rec. of the 3d Mtg., U.N. Doc. A/CONF.2/SR.3 at 14 (Nov. 19, 1951). Thus, neither the legislative history of the relevant United

States statutes nor the negotiating history of the pertinent international agreements sheds much light on the meaning of the phrase "particular social group."

Our role in the process of interpreting this phrase, however, is quite limited. As the Supreme Court has explained, the Board of Immigration Appeals' interpretation of a provision of the Refugee Act is entitled to deference pursuant to the standards set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Cardoza–Fonseca,* 480 U.S. at 445–50, 107 S.Ct. at 1220–23; *id.* at 453–55, 107 S.Ct. at 1224–25 (Scalia, J., concurring in the judgment). Thus, in considering an interpretation adopted by the Board, we must ask "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. If it has not, we may not "simply impose [our] own construction on the statute." *Id.* at 843, 104 S.Ct. 2782. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

■ Here, the Board has interpreted the phrase "particular social group." In *Matter of Acosta,* 19 I. & N. Dec. 211, 233 (BIA 1985), the Board noted that the United Nations Protocol refers to race, religion, nationality, and political opinion, as well as membership in a particular social group. Employing the doctrine of *ejusdem generis,* the Board then reasoned that a particular social group refers to "a group of persons all of whom share a common, immutable characteristic." *Id.* The Board explained:

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former mil-

---

**6.** The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102, amended the provision on withholding of deportation, Section 243(h) of the INA, 8 U.S.C. § 1253(h), and added provisions on asylum, Sections 207 and 208 of the INA, 8 U.S.C. §§ 1157 and 1158, and a definition of a "refugee," Section 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A).

**7.** The only difference between the language in the Convention and the language in the INA is that the Convention refers to "membership *of* a particular social group" (emphasis added), whereas the INA refers to "membership *in* a particular social group" (emphasis added).

**8.** 1 Grahl–Madsen, *supra* note 5, at 219.

itary leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

*Id.* We have no doubt that this is a permissible construction of the relevant statutes, and we are consequently bound to accept it.[9]

■ With this understanding of the phrase "particular social group" in mind, we turn to the elements that an alien must establish in order to qualify for withholding of deportation or asylum based on membership in such a group. We believe that there are three such elements. The alien must (1) identify a group that constitutes a "particular social group" within the interpretation just discussed, (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership.

■ In the excerpt from *Acosta* quoted above, the Board specifically mentioned "sex" as an innate characteristic that could link the members of a "particular social group." Thus, to the extent that the petitioner in this case suggests that she would be persecuted or has a well-founded fear that she would be persecuted in Iran simply because she is a woman, she has satisfied the first of the

three elements that we have noted. She has not, however, satisfied the third element; that is, she has not shown that she would suffer or that she has a well-founded fear of suffering "persecution" based solely on her gender.

■ In *Acosta*, the BIA discussed the meaning of the term "persecution," concluding that "the pre-Refugee Act construction" of that term should still be followed. *Acosta,* 19 I. & N. Dec. at 222. Heeding this construction, the BIA interpreted "persecution" to include threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom. By contrast, the BIA suggested that "[g]enerally harsh conditions shared by many other persons" do not amount to persecution. *Id.* Among the pre-Refugee Act cases on which the BIA relied was *Blazina v. Bouchard,* 286 F.2d 507, 511 (3d Cir.), *cert. denied,* 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961), where our court noted that the mere "repugnance of ... a governmental policy to our own concepts of ... freedom" was not sufficient to justify labelling that policy as persecution. Thus, we interpret *Acosta* as recognizing that the concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country—and it seems most unlikely that Congress intended such a result.[10]

9. The Board in *Matter of Acosta,* 19 I. & N. Dec. 211, 229, also held that an alien seeking asylum must show a realistic likelihood of persecution. In *Cardoza–Fonseca,* 480 U.S. at 447–49, 107 S.Ct. at 1221–22, the Supreme Court rejected this interpretation as contrary to the plain language and the legislative history of the INA.

In the case now before us, we consider the BIA's interpretation of other provisions of the INA, specifically the terms "particular social group" (*see* pp. 1238–40, *supra*) and "persecution" (*see* pp. 1240–41, *infra*). These interpretations were also set out in *Matter of Acosta,* but needless to say, the mere fact that *Acosta's* interpretation of one portion of the INA was held to be impermissible does not mean that *Acosta's* interpretation of other, entirely different statutory language, is also impermissible.

10. We are convinced that the BIA's interpretation of "persecution," like its interpretation of "particular social group," is permissible and thus must be followed. In ordinary usage, the term "persecution" denotes extreme conduct. For example, *The Random House Dictionary of the English Language* 1444 (2d ed. 1987) defines the term to mean "a program or campaign to exterminate, drive away, or subjugate a people because of their religion, race, or beliefs." We are aware of nothing indicating that Congress intended to depart from the ordinary meaning of the term "persecution." Moreover, authoritative interpretations of the United Nations Convention and Protocol also recognize that the concept of persecution refers to extreme conduct. *See, e.g.,* United Nations High Commissioner for Refugees, *Handbook of Procedures, supra,* note 5, §§ 51, 54, 55.

In this case, the evidence in the administrative record regarding the way in which women in Iran are generally treated is quite sparse. We certainly cannot say that "a reasonable factfinder would have to conclude," based on that record, that the petitioner, if returned to Iran, would face treatment amounting to "persecution" simply because she is a woman. *See INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). While the amici supporting the petitioner have called to our attention articles describing the harsh restrictions placed on all women in Iran, the facts asserted in these articles are not part of the administrative record. "Only the record of the administrative proceeding itself is pertinent and relevant in this type of action." *Scalzo v. Hurney,* 338 F.2d 339, 340 (3d Cir.1964), *cert. denied,* 382 U.S. 849, 86 S.Ct. 93, 15 L.Ed.2d 87 (1965); *see also* 8 U.S.C. § 1105a(a)(4); *Tovar v. INS,* 612 F.2d 794, 797 (3d Cir.1980) ("the petition shall be determined solely upon the administrative record upon which the deportation order is based").

The petitioner's primary argument, in any event, is not that she faces persecution simply because she is a woman. Rather, she maintains that she faces persecution because she is a member of "a very visible and specific subgroup: Iranian women who *refuse to conform* to the government's gender-specific laws and social norms." Petitioner's Br. at 12 (emphasis added). This definition merits close consideration. It does not include all Iranian women who hold feminist views. Nor does it include all Iranian women who find the Iranian government's "gender-specific laws and repressive social norms" objectionable or offensive. Instead, it is limited to those Iranian women who find those laws so abhorrent that they "refuse to conform"—even though, according to the petitioner's brief, "the routine penalty" for noncompliance is "74 lashes, a year's imprisonment, and in many cases brutal rapes and death." *Id.* at 14.

Limited in this way, the "particular social group" identified by the petitioner may well satisfy the BIA's definition of that concept, for if a woman's opposition to the Iranian laws in question is so profound that she would choose to suffer the severe consequences of noncompliance, her beliefs may well be characterized as "so fundamental to [her] identity or conscience that [they] ought not be required to be changed." *Acosta,* 19 I. & N. Dec. at 234. The petitioner's difficulty, however, is that the administrative record does not establish that she is a member of this tightly defined group, for there is no evidence in that record showing that her opposition to the Iranian laws at issue is of the depth and importance required.

The Iranian restriction discussed most prominently in the petitioner's testimony was the requirement that women wear the chador or traditional veil, but the most that the petitioner's testimony showed was that she would find that requirement objectionable and would seek to avoid compliance if possible. When asked whether she would prefer to comply with that law or suffer the consequences of noncompliance, she stated only that she "would try to avoid" wearing a chador as much as she could. Similarly, her brief to the BIA stated only that she would seek to avoid Islamic practices "as much as she could." She never testified that she would refuse to comply with the law regarding the chador or any of the other gender-specific laws or social norms. Nor did she testify that wearing the chador or complying with any of the other restrictions was so deeply abhorrent to her that it would be tantamount to persecution. Instead, the most that emerges from her testimony is that she would find these requirements objectionable and would not observe them if she could avoid doing so. This testimony does not bring her within the particular social group that she has defined—Iranian women who *refuse to conform* with those requirements even if the consequences may be severe.

The "particular social group" that her testimony places her within is, instead, the presumably larger group consisting of Iranian women who find their country's gender-specific laws offensive and do not wish to comply with them. But if the petitioner's "particular social group" is defined in this way, she cannot prevail because the administrative record does not satisfy the third element

described above, i.e., it does not show that the consequences that would befall her as a member of that group would constitute "persecution." According to the petitioner, she would have two options if she returned to Iran: comply with the Iranian laws or suffer severe consequences. Thus, while we agree with the petitioner that the indicated consequences of noncompliance would constitute persecution, we must still inquire whether her other option—compliance—would also constitute persecution.

In considering whether the petitioner established that this option would constitute persecution, we will assume for the sake of argument that the concept of persecution is broad enough to include governmental measures that compel an individual to engage in conduct that is not physically painful or harmful but is abhorrent to that individual's deepest beliefs. An example of such conduct might be requiring a person to renounce his or her religious beliefs or to desecrate an object of religious importance. Such conduct might be regarded as a form of "torture" and thus as falling within the Board's description of persecution in *Acosta. See Acosta*, 19 I. & N. Dec. at 222–23. Such a requirement could constitute "torture" or persecution, however, only if directed against a person who actually possessed the religious beliefs or attached religious importance to the object in question. Requiring an adherent of an entirely different religion or a non-believer to engage in the same conduct would not constitute persecution.[11]

Here, while we assume for the sake of argument that requiring some women to wear chadors may be so abhorrent to them that it would be tantamount to persecution, this requirement clearly does not constitute persecution for *all* women. Presumably, there are devout Shiite women in Iran who find this requirement entirely appropriate. Presumably, there are other women in Iran who find it either inconvenient, irritating, mildly objectionable, or highly offensive, but for whom it falls short of constituting persecution. As we have previously noted, the petitioner's testimony in this case simply does not show that for her the requirement of wearing the chador or complying with Iran's other gender-specific laws would be so profoundly abhorrent that it could aptly be called persecution. Accordingly, we cannot hold that she is entitled to withholding of deportation or asylum based on her membership in a "particular social group."

C. The petitioner also argues that she is entitled to withholding of deportation or asylum based on her "political opinion," but her brief treats this argument as essentially the same as her argument regarding membership in a particular social group. Indeed, her brief relegates discussion of this entire subject to a single short footnote that simply states that her "political claim is intertwined with her social group claim." Petitioner's Br. at 10 n. 8. We agree that these two arguments are closely linked in the present case, and we hold that the petitioner's argument regarding political opinion fails for reasons similar to those already discussed in relation to her argument based on group membership.

In order to prevail on a withholding-of-deportation or asylum claim based on political opinion, an alien must (1) specify the political opinion on which he or she relies, (2) show that he or she holds that opinion, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that opinion. In this case, if the petitioner's political opinion is defined simply as "feminism," she would presumably satisfy the first element, for we have little doubt that feminism qualifies as a political opinion within the meaning of the relevant statutes. Similarly, she might well satisfy the second element, since she testified at some length and in some detail about her feminist views. She could not, however, satisfy the third element because the administrative record does not establish that Iranian feminists are generally subjected to treatment so harsh that it may accurately be described as "per-

---

11. We do not suggest that an alien could establish that he or she would be persecuted or has a well-founded fear of persecution based solely on his or her subjective reactions. Presumably, conduct could not constitute persecution or "torture" within *Acosta* unless an objective requirement is also satisfied.

secution." Once again, we emphasize that we are restricted to the administrative record before us and that "persecution" is an extreme concept that does not include every sort of treatment our society regards as offensive.

If the petitioner's political opinion is given a narrower definition similar to her definition of her "particular social group"—e.g., as the opinion that Iran's "gender-specific laws and repressive social norms" must be disobeyed on grounds of conscience—then the administrative record, for the reasons already discussed, does not show that the petitioner possesses that opinion. In sum, whether her argument is couched in terms of membership in a "particular social group" or in terms of "political opinion," the administrative record is insufficient to show that she has a well-founded fear of persecution.[12]

### III.

The petitioner's final argument is that the Board of Immigration Appeals improperly denied her request for suspension of deportation under Section 244(a)(1) of the INA, 8 U.S.C. § 1254(a)(1). This provision gives the Attorney General the discretion to suspend the deportation of certain aliens who have been physically present in the United States for at least seven years, possess good moral character, and "in the opinion of the Attorney General," would experience "extreme hardship" if returned to their home countries. Here, the immigration judge and the BIA held that the petitioner was not eligible for this relief because she would not suffer "extreme hardship" if returned to Iran.

In determining whether a decision of the BIA regarding "extreme hardship" is substantively correct, our standard of review is narrow. See, e.g., INS v. Jong Ha Wang, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); Dill v. INS, 773 F.2d 25, 31 (3d Cir.1985); Amezquita–Soto v. INS,

708 F.2d 898, 902 (3d Cir.1983). In this case, however, the petitioner does not contend that the BIA's decision was substantively incorrect. Instead, she argues that the BIA committed a procedural error because it "failed to separately assess the facts ... using the 'extreme hardship' analysis." Petitioner's Br. at 18 (footnote omitted). Relying on Revancho v. INS, 658 F.2d 169 (3d Cir.1981), among other cases, she contends that the BIA committed a serious procedural mistake by failing to consider the following facts: she is a feminist; she has lived in this country since age 18 and has not visited Iran since initially coming here; she does not practice Islam; she "does not believe that social and religious norms should be imposed upon her by the Iranian government"; and, if returned to Iran, she would resist the government's gender-specific restrictions.

We reject the petitioner's procedural argument because we see no indication that the BIA failed to consider the facts the petitioner now cites. Almost all of these facts were among those upon which she relied in her claims for withholding of deportation and asylum. The BIA noted this overlap and found that the facts that the petitioner had adduced in support of her withholding-of-deportation and asylum claims did not establish the "extreme hardship" needed for suspension of deportation. Thus, it is apparent that the BIA considered those facts in making its determination regarding "extreme hardship."

Of the facts cited in the petitioner's brief, the only ones that were not central to her withholding-of-deportation and asylum claims are the fact that she has resided in this country since age 18 and the fact that she has not visited Iran since she first came here. These facts, however, have modest probative value at best in the present context, and thus we cannot assume, based on the BIA's failure to mention these facts in the portion of its

12. The petitioner contends that the BIA violated 8 C.F.R. § 208.13(b)(2)(i) (1993) by requiring that she show that she would be "singled out" for persecution. This regulation, however, does not apply to applications, like the petitioner's, filed before October 1, 1990. See 8 C.F.R. § 208.1(a) (1993). Moreover, we interpret the BIA's reference to "singl[ing] out" to mean, in

the context of its entire opinion, that the petitioner had not shown that she and the other members of her group would be persecuted but only that they would be subjected to "the same restrictions and regulations applicable to the Iranian population in general." See App. at 11. Interpreted in this way, the BIA's statement did not constitute legal error.

opinion concerning suspension of deportation, that it failed to consider them.

## IV.

In conclusion, we hold, in light of the administrative record before us, that the petitioner did not establish that she was entitled to withholding of deportation or that she was eligible for asylum. We also hold that the BIA did not commit any reversible procedural error in its rejection of her claim for suspension of deportation. We therefore deny the petition for review.