

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-29-2005

# Amjad v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3709

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Amjad v. Atty Gen USA" (2005). *2005 Decisions.* Paper 199.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/199

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

Nos. 04-3709, 04-4647

_____

RAFIQ AMJAD and ASTER AMJAD,
Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

_____

Petition for Review of the Order
of the Board of Immigration Appeals
(A95 467 602, A95 467 603)

_____

Argued October 24, 2005

Before: SLOVITER, FISHER, Circuit Judges,
and THOMPSON, District Judge*

(Filed: November 29, 2005)

_____

Michael Morrone   (Argued)
Bloomington, IN 47401

    Attorney for Petitioner

Peter D. Keisler
    Assistant Attorney General
Christopher C. Fuller
    Senior Litigation Counsel

_____

\*     Hon. Anne E. Thompson, United States District Judge for the District of New
Jersey, sitting by designation.

Jonathan Potter
Jill Ptacek,    (Argued)
  Trial Attorney
United States Department of Justice
Office of Immigration Litigation
Washington, DC 20044

    Attorneys for Respondent

OPINION

SLOVITER, Circuit Judge.

Petitioners Rafiq Amjad[1] and his wife Aster Amjad seek review of the final order issued by the Board of Immigration Appeals ("BIA") affirming the determination of the Immigration Judge ("IJ") denying petitioners' application for asylum, application for withholding of removal to Pakistan, and request for relief under Article Three of the UN Convention Against Torture ("CAT"). For the reasons that follow, we will deny the petition for review.

**I.**

The Amjads are natives and citizens of Pakistan. They entered the United States on June 31, 2001 on visitors visas, but overstayed their approved period of stay and filed for asylum on May 17, 2002. On November 5, 2002, the INS issued Notices to Appear

---

[1] Petitioners note that Mr. Rafiq's first and last name have been reversed in the case caption and request that the caption be corrected if possible. (Pet. Br. 2) For purposes of this opinion, we will use the official case caption and refer to the male petitioner as "Mr. Amjad."

2

("NTA") charging that the Amjads were removable aliens who had remained in the United States without authorization. At the initial removal hearing on December 3, 2002, the Amjads conceded removability but renewed their applications for asylum, withholding of removal and CAT protection.

At a hearing before an IJ, Mr Amjad testified that he and his wife fled Pakistan because they were Christians living in a predominately Muslim country and, as such, suffered persecution. Mr. Amjad stated that he was born and baptized a Christian in Pakistan and that his parents and grandparents were also Christians. He further testified that he had attended a Methodist Church in Pakistan and that he was ordained a Methodist pastor in 1995 after attending pastoral training at the Methodist Independent School in Pakistan. Mrs. Amjad also testified that she was born Christian and had attended a Methodist Church in Pakistan.

Mr. Amjad testified that he had worked as a Methodist pastor in Pakistan from 1995 to 2000, during which period Muslims had opposed and threatened him. He testified that the leader of the mosque (i.e., "Iman")[2] in a village where he served as a full-time pastor told him "he could not use loud speakers and . . . should not hold Bible studies," and that on one occasion the same Iman and a group of individuals stopped him on his way home from preaching and punctured his motorcycle tires. App. at 20.

---

[2] In referring to the "Iman," we use the spelling adopted by the IJ.

3

Mr. Amjad further testified that he was transferred to the city of Lahore because of the problems he was facing, that his parents moved with him due to similar problems, and that while in Lahore he started a pre-school for young children in a building connected to his church and a sewing school for young women that was run by his wife. He testified that the sewing school enrolled twenty-eight girls, four of whom were Muslim, and that the Muslim students told their parents that they were being forced to participate in Christian ceremonies. Both Amjads testified that because of this, they started receiving threatening phone calls and some Muslim boys had followed Mrs. Amjad home and tried to attack her, which problems eventually escalated to the point that the Amjads were forced to close both schools.

At the conclusion of the testimony, the IJ issued an opinion finding that the Amjads' testimony was not credible. Although the IJ stated that "the court will take administrative notice that during these times Christians are in a precarious position in Pakistan," she concluded that the Amjads had failed to establish that they were being persecuted for being Christians and denied their applications for asylum, withholding of removal and CAT protection.

The IJ noted that the Amjads were basing their claim of past persecution and fear of likely future persecution not just on the fact that they were Christians, but on the facts that they faced greater persecution because Mr. Amjad was a Methodist pastor and that they both played a visible role in the Methodist Church. The IJ was especially critical of

the Amjads' perceived lack of knowledge about the Methodist Church in light of their purported leadership roles.

The IJ questioned Mr. Amjad during his testimony about various aspects of the Methodist faith. Mr. Amjad was unable to identify the founder of the Methodist Church, the religion of Jesus Christ, or the most significant event in his favorite book of the Bible. (App. 34-36) Based on the IJ's view that Mr. Amjad had not satisfactorily answered these and other questions, the IJ concluded that Mr. Amjad was "totally lacking in knowledge about the Methodist Church," App. at 35, and that when "one holds himself out as a pastor, a leader, a scholar of a particular religion, one would expect this individual to have at least a minimum amount of knowledge about the religion which they [sic] profess to adhere to, and in this case the respondent's lack of knowledge about the church certainly is a reflection on his credibility." App. at 37.

The IJ pointed to many other discrepancies in the Amjads' testimony to support her adverse credibility determination. She noted that Mr. Amjad has a Muslim name and that if he were born and baptized a Christian it would be "highly unlikely" that a Christian family would give their child a Muslim name. App. at 35. She also pointed out that, when questioned, Mr. Amjad's knowledge of the Koran was greater than his knowledge of Christianity, leading her to doubt whether he was even a Christian in Pakistan and to suspect that his knowledge of Christianity may have come from attending church in the United States.

5

The IJ also discounted the testimony of witnesses who testified on behalf of the Amjads. The witnesses who testified at the hearing were the Amjads' brother-in-law and a reverend from the church the Amjads were attending in the United States. The IJ concluded that these witnesses were testifying only about what they were told by Mr. Amjad because they could not provide independent corroboration of the events in Pakistan. (App. 41-42) Furthermore, the IJ gave little weight to letters presented by Mr. Amjad, purportedly from a Methodist minister in Pakistan, stating that Mr. Amjad was a pastor. The IJ concluded that the letters were "questionable" considering their grammatical and spelling errors and that they were "self serving" at the very least. App. at 36.

On appeal, the BIA affirmed. The BIA noted that the Amjads were unable to respond to basic questions about the Methodist faith, and concluded:

> The respondents' claim for asylum is predicated upon their Christian religious beliefs, as such, the absence of knowledge regarding those beliefs goes to the very heart of their claim and supports the Immigration Judge's determination. Consequently, we conclude that the respondents have failed to provide a plausible and coherent account of the basis of their fear.

App. at 7.

The Amjads timely filed a petition for review with this court and moved for a stay of removal pending review, which we granted on December 1, 2004.

## II.

To qualify as a "refugee" who may receive asylum, an alien must establish that

s/he is unable or unwilling to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (citation omitted). The persecution alleged must be at the hands of "the government or forces the government is either unable or unwilling to control." Gao v. Ashcroft, 299 F.3d 266, 272 (3d. Cir. 2002) (citation omitted).

To establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident (or incidents) that constituted persecution; (2) that occurred on account of one of the statutorily protected grounds; and (3) that was (or were) committed by the government or forces the government is either unable or unwilling to control. Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004). The BIA and this court have interpreted "persecution" to include conduct or conditions "so severe that they constitute a threat to life or freedom." Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993). Thus, "persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." Id. at 1240.

Whether an applicant has demonstrated "persecution or a well-founded fear of persecution" on account of a statutorily enumerated factor is a factual determination, which this court reviews under the substantial evidence standard. Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004). Under this highly deferential standard, the IJ's finding must be upheld unless "the evidence not only *supports*" a contrary conclusion, "but

7

*compels* it." Elias-Zacarias, 502 U.S. at 481 n.1. Thus, the IJ's determinations will be upheld to the extent that they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 481 (citation omitted).

The Amjads contend that the IJ violated due process by failing to consider objective evidence of Mr. Amjad's status as a pastor in her finding this aspect of his testimony incredible. The evidence presented by the Amjads that they claim the IJ failed to consider includes: photographs purporting to show Mr. Amjad in a leadership role during a Christian ceremony; marriage and birth certificates indicating the Amjads are Christian; passports which list their religion as Christian and Mr. Amjad's occupation as a pastor; and letters indicating that Mr. Amjad is a pastor and documenting his struggles with Muslims. They assert that the IJ failed to consider this evidence because it was not mentioned in her opinion.

In removal proceedings, the IJ "shall consider evidence submitted by the applicant together with his or her asylum application, as well as any evidence submitted by the applicant before or at the interview." 8 C.F.R. § 208.9(e). However, we have stated that the IJ does not have to comment on every piece of evidence in the record. Liu v. Ashcroft, 372 F.3d 529, 531 n.3 (3d Cir. 2004); see also, Chen v. Ashcroft, 376 F.3d 215 (3d Cir. 2004) (holding that evidence in the record considered as a whole was substantial enough to support adverse credibility determination).

The IJ focused on one primary inconsistency in the Amjads' testimony when

8

finding them not credible. She questioned Mr. Amjad on the fundamental aspects of Christianity and the Methodist Church and concluded that his inability to respond to these questions seriously undermined his credibility given that he was alleging to be a pastor. She further concluded that the Amjads' knowledge of the Bible was inconsistent with their testimony that they taught Bible studies in Pakistan.

The Government argues that the inconsistencies relied upon by the BIA and the IJ are not minor, but instead they go to the "heart of the Amjads' asylum claims." Respondent's Br. at 22. The Amjads respond that the IJ's credibility determination is not supported by substantial evidence because the IJ's reasoning is based upon her questions about Christianity and the record contains no information about Christian doctrine.

Rather than decide this case on the Amjads' knowledge of Christianity in general and the fundamentals of Methodist religion, we turn to a more striking deficiency in their case – the lack of evidence that the Pakistani government was responsible for the incidents on which they base their claim of persecution. We repeat that portion of their brief verbatim:

> (1) recurring incidents in which [Mr. Amjad] was identified and warned to stop his pastoral work;
>
> (2) threats by Muslim fanatics to burn the church and school when he worked at St. Dominic school in 1995;
>
> (3) beating of Fr. Javaid at St. Dominic's in 1995;
>
> (4) attacks, insults, threats during full-time pastoral work from 1996-2000, by Muslim fanatics who wanted Mr. Rafiq to stop his pastoral work;

9

(5) in August 1997, a village mayor of sorts in one of the town's he visited with some councilmen and used a tractor to knock over a church that one of his congregations was building;

(6) In one of the towns, Mr. Rafiq had to end his pastoral work, because the Muslims who owned most of the businesses where the Christians work told the Christians that they would be fired if they went to the Christian services;

(7) On December 20, 2000, at the church in Lahore, there was a scuffle at a church party, because some local Muslim men began to fight with some of the churchgoers who were having a Christmas party;

(8) On December 22, 2000, rape charges were fabricated against one of the boys who attended the church (and who was a singer at the December 20th party). He was held in jail for two weeks, during which he was beaten. No charges were filed;

(9) In April 2001, Mr. Rafiq and Ms. Amjad started a sewing school that included a mix of Christian and Muslim students. Two of the Muslim students complained that they heard Bible verses and that Muslims were being taught about Christianity. The girls' parents told the Rafiqs they were committing Blasphemy;

(10) Also in April, a Muslim boy stalked Ms. Amjad and threatened to harm Mr. [Amjad];

(11) In April and May 2001, the threats escalated and culminated in a Muslim mob screaming and forcing them to close school.

Petitioners' Brief at 7-8 (citations omitted).

In response to this court's request that the parties point to evidence in the record that addresses whether past persecution set forth on pages 7 and 8 of Petitioners' Brief was committed by the Government of Pakistan or forces that the Government either is unwilling or unable to control, counsel for the Petitioners responded that "the Government of Pakistan is acquiescent and is in certain ways an active participant in

10

violence against Christians;" "violence against Christians is common place in Pakistan;" Government officials are implicated in three of the listed incidents; and the Country Conditions support Mr. Amjad's testimony about the "fecklessness of notifying the police about the violence and threats perpetrated by Muslims against him or his wife." Petitioners' Response to the Court's Supplementary Request at 1-2 (October 24, 2005). We are not persuaded.

As its response to this court's inquiry, the Government notes that neither of the Petitioners testified or suggested that they sought protection of the Government or that such protection was not afforded them when it was sought. Although the Government reports recognize that there were instances in which the Pakistani Government failed to intervene in cases of societal violence directed at minority religious groups, the United States Department of State Reports included in the Administrative Record states that the Pakistani Government does not encourage sectarian violence. Of most significance in the Government's response is the statement that "none of the evidence presented directly relating to the Amjads' experiences in Pakistan compels the conclusion that the Amjads have been, or will be, subjected to persecution by the government, or by private individuals which the government is 'unable to unwilling' to control." Respondent's Response to the Court's Supplementary Request at 3 (October 21, 2005).

As we noted earlier, the past persecution that will support a presumption of future persecution is persecution at the hands of the government or forces the government is

11

either unable or unwilling to control. The evidence in this record does not support the Amjads' assertion that they have satisfied this requirement. Accordingly, we will deny the Petition for Review.

Amjad v. Attorney General of the United States,
Nos. 04-3709, 04-4647

THOMPSON, District Judge, Concurring.

In addition to the arguments addressed in the majority opinion, Petitioners also argued that the translator employed at their asylum hearing was not familiar with Christian terminology and therefore interpreted words relating to Christianity poorly (e.g., translating "Genesis" as "the book of birth"). The BIA denied Petitioners' request for an evidentiary hearing, stating that it would not consider the translation issue because counsel for Petitioners had failed to object to the poor translation at the asylum hearing. The BIA has not responded to Petitioners' subsequent requests for access to the audio recording of the hearing.

The substantial evidence standard requires a reviewing court to afford great deference to an IJ's credibility determinations because the IJ is best positioned to observe and assess an asylum applicant's testimony and demeanor. See Dia v. Ashcroft, 353 F.3d 228, 252 n.23 (3d. Cir 2003). That standard is strained, however, where the IJ's evaluation is based on a potentially inaccurate translation of the applicant's testimony. An adverse credibility determination based on potentially inaccurate information stemming from poor translation is hardly more reliable than one based on speculation or conjecture. See Dia, 353 F.3d at 249.

Attorneys representing asylum applicants cannot reasonably be required to speak

13

the various languages of their clients and cannot be expected to know whether or not a translation is objectionable without further investigation after the hearing. I would find that the BIA was unreasonable to require Petitioners' counsel to object to the translation problems during the asylum hearing and should have given Petitioners access to the audio tapes of the hearing. Nonetheless, I agree with the majority that Petitioners have not shown that the government of Pakistan was responsible for any of the incidents of past persecution. Therefore, I concur in the result.