NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 24-1755

———————

RONALDO ELIAS DA SILVA; CRISTINA APARECIDA DE LANA SILVA;
E.R.D.S.; M.G.D.S.,
Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA.

———————

On Petition for Review of a Final Order of the
Board of Immigration Appeals
(Nos. A216-983-704, A216-983-705, A216-983-706, A216-983-707)
Immigration Judge: Jason L. Pope

———————

Submitted Under Third Circuit L.A.R. 34.1(a)
January 28, 2025

Before: SHWARTZ, KRAUSE, and PORTER, *Circuit Judges*.

(Filed: March 4, 2025)

———————

OPINION*

———————

---

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

PORTER, *Circuit Judge*.

Ronaldo Elias da Silva, his wife, and their two children (collectively, the "da Silvas") are Brazilian nationals petitioning for review of their respective final removal orders. For the reasons below, we will deny their petitions.

I

The da Silvas allege that, back in Brazil, unknown individuals fired gunshots at Ronaldo's car on May 16, 2021. Ronaldo drove to the police station and filed a report complaining about drugs in his neighborhood. Later that day, two armed men showed up at the da Silvas' house and told Ronaldo that he "should not [have] do[ne] that." Administrative Record ("A.R.") at 163. Armed men also searched for Ronaldo's daughter at her school. Undeterred, Ronaldo filed a second report the next day. The police advised Ronaldo to leave the city. The da Silvas fled to another city in Brazil, about an hour-and-a-half away, and stayed with family for ten days. Ronaldo testified that the armed men seemed to stop looking for him while the da Silvas were away. But believing they were still in danger, they continued to the United States, arriving on or about May 28, 2021.

Removal proceedings against the da Silvas began on October 2, 2021. The da Silvas admitted the factual allegations in their respective Notices to Appear and conceded removability. The da Silvas filed applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

The Immigration Judge ("IJ") denied the da Silvas' requests for relief from removal. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision. This petition for review followed.

II

We have jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a). Venue is proper because the immigration proceedings were completed in Newark, New Jersey. 8 U.S.C. § 1252(b)(2). While we review the BIA's factual findings for substantial evidence, we review its legal determinations, including "its legal conclusion that those facts did not amount to torture and government acquiescence" under CAT de novo. *Manuel-Soto v. Att'y Gen.*, 121 F.4th 468, 472 (3d Cir. 2024).

III

A

To be eligible for asylum, an applicant "must demonstrate that he is a 'refugee' within the meaning of 8 U.S.C. § 1101(a)(42)." *Chavarria v. Gonzalez*, 446 F.3d 508, 515–16 (3d Cir. 2006). That requires a well-founded fear of persecution on the basis of a protected ground—race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42). The protected ground must be "an essential or principal reason for the persecution." *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 (3d Cir. 2015); *see also* 8 U.S.C. § 1158(b)(1)(B)(i). Persecution means "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993); *see also Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985). "'[G]enerally harsh conditions shared by many other persons' do not amount to persecution." *Fatin*, 12 F.3d at 1240 (quoting *Acosta*, 19 I. & N. Dec. at 222). Where an applicant for asylum establishes past

3

persecution, a presumption arises that the applicant has a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1).

With this framework in mind, the BIA did not err by concluding that the da Silvas are ineligible for asylum. The da Silvas claim membership in the following particular social groups: "[i]nformants who cannot get protection from the Brazilian police;" "[c]rime victims who cannot get protection from the Brazilian police;" and "[w]histleblowers who cannot get protection from the Brazilian police." Pet'rs' Opening Br. at 13. But since none of those groups "exist independently of the persecution suffered," they are not cognizable. *Lukwago*, 329 F.3d at 172.

The da Silvas argue that their proposed groups exist independently of their persecution because "the fact that . . . they can't get protection from the Brazilian police is not the harm." Pet'rs' Opening Br. at 13. That argument is unconvincing. As the Court in *Lukwago* suggested, the prohibition against defining a "particular social group" with reference to the group's shared experience of persecution is substantive: it avoids a circularity that, if permitted, would end-run Congress' judgment that asylum is only available to those that have been persecuted on account of certain grounds. 8 U.S.C. § 1101(a)(42)(A); *Lukwago*, 329 F.3d at 172. Reframing a group's shared experience to be the inability of the group to be protected from persecution, as opposed to the persecution itself, does nothing to address that concern.

The da Silvas' applications for asylum based on political opinion likewise falter. For asylum claims premised on political opinion, it is essential that the persecutor attribute a political opinion to the applicant, otherwise persecution cannot be on account

4

of opinion. *Guzman Orellana v. Att'y Gen.*, 956 F.3d 171, 180 (3d Cir. 2020). The da Silvas argue that the BIA erred in determining that they do not have a well-founded fear of persecution on the basis of their pro-whistleblowing political opinion. Although the BIA recognized that "pro-whistleblowing" is a cognizable political opinion, it concluded that the da Silvas had not demonstrated persecution on the basis of an actual or imputed political opinion. Whether persecution has been on the basis of a political opinion is a factual determination that we review for substantial evidence. *See Lukwago*, 329 F.3d at 176. Asked at his hearing whether Ronaldo or his wife ever "publicly express[ed] any political opinion in Brazil, or any anti-crime or anti-drug political opinion in Brazil," Ronaldo answered, "[n]o." A.R. at 175. In light of this testimony and in the absence of any evidence to the contrary, we cannot say that the BIA erred.

## B

Because the standard for withholding of removal is higher than that for asylum, applicants ineligible for asylum are necessarily also ineligible for withholding of removal. *Lukwago*, 329 F.3d at 182. Accordingly, the BIA did not err in denying the da Silvas' requests for withholding of removal.

## C

The standard for protection under CAT requires applicants to show "that it is more likely than not that he or she would be tortured if removed." 8 C.F.R. § 1208.16(c)(2). "Torture" under CAT "is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official." 8 C.F.R. § 1208.18(a)(1). Officials

acquiesce when they are "willfully blind to torturous conduct and breach their legal responsibility to prevent it," or collude with the torturers. *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 70 (3d Cir. 2007). The da Silvas argue that the BIA erred in concluding that they failed to establish that it is more likely than not that they will be tortured if removed to Brazil. We cannot say the BIA erred in concluding that the da Silvas did not show that they would be subject to torture, or that Brazilian authorities would acquiesce to such treatment. Although Ronaldo believed his pursuers would try to kill him if he returned to Brazil, it is the BIA's and IJ's prerogative to disagree with applicants on the basis of other evidence in the record, such as the fact that when the da Silvas fled to a nearby city, the armed men "stop[ped] looking for [them]." A.R. 166. Moreover, the police here were receptive to Ronaldo's plight, and there is no evidence that public officials were colluding with the da Silvas' tormentors. Indeed, Ronaldo testified that the Brazilian police took multiple reports. In light of this testimony and without evidence suggesting otherwise, we again cannot say that the BIA erred.

*       *       *

Accordingly, we will deny the da Silvas' petitions.