**Hong Ying GAO Petitioner,**

v.

**Alberto GONZALES,[1] Respondent.**

**Docket No. 04–1874–ag.**

United States Court of Appeals,
Second Circuit.

Submitted: Jan. 30, 2006.
Decided: March 3, 2006.

---

1. United States Attorney General Alberto Gonzales is substituted as Respondent. *See* Fed. R.App. P. 43(c)(2).

Hong Ying Gao, pro se.

Sandra Henson Kinney, Assistant United States Attorney (Kasey Warner, United States Attorney for the District of West Virginia, on the brief), Charleston, West Virginia for Respondent.

Before: CALABRESI, STRAUB, and WESLEY, Circuit Judges.

STRAUB, Circuit Judge.

Petitioner Hong Ying Gao ("Gao") petitions for review of a Board of Immigration Appeals ("BIA") decision summarily affirming an Immigration Judge's ("IJ") denial of her claims for asylum, withholding of removal, and protection under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85. Gao argues that the IJ erred in finding that she did not have a well-founded fear of forced marriage and in finding that a forced marriage, even were it to occur, would not constitute persecution under paragraph 1101(a)(42) of Title 8 of the United States Code, which sets forth the grounds for establishing asylum eligibility.

We agree with Gao that the IJ, in finding that Gao's problems were not "on account of" a legally protected ground, failed to apply the correct definition of the "particular social group" ground as established by BIA and judicial precedent. As this precedent makes clear, the statutory term "particular social group" is broad enough to encompass groups whose main shared trait is a common one, such as gender, at least so long as the group shares a further characteristic that is identifiable to would-be persecutors and is immutable or fundamental. We further find that the IJ's decision was based, in part, on certain factual conclusions reached without substantial evidence: namely, that the government might be willing and able to protect Gao and that Gao could internally relocate within China. Accordingly, we remand for further proceedings.

## BACKGROUND

### I. Factual History

Because the IJ found Gao to be credible, we take as true the facts Gao presented to the IJ. *See Bocova v. Gonzales,* 412 F.3d 257, 262–63 (1st Cir.2005). Gao, who was twenty years old when she left China, grew up in a rural village in the Fujian Province. In this region of China, parents routinely sell their daughters into marriage, and this practice is sanctioned by society and by the local authorities.

When Gao was nineteen years old, her parents, through a broker, sold Gao to a man named Chen Zhi; in return for an upfront payment of 18,800 RBM, Gao's parents promised that Gao would marry Zhi when she turned twenty-one. Gao's parents used this money to pay off previous debts. At first, Gao acquiesced in the arrangement under pressure from her parents. However, because Zhi soon proved to be bad-tempered, and gambled, and beat her when she refused to give him money, Gao decided that she did not want to marry Zhi. When Gao tried to break their engagement, Zhi threatened her. He also threatened that, if she refused to marry him, his uncle, a powerful local official, would arrest her. Gao had heard that Zhi's uncle had arrested other individuals for personal reasons, and so she was afraid the same would happen to her.

To escape Zhi, Gao moved an hour away by boat and took a job in the Mawei district of Fuchou. Zhi continued to visit Gao's family and demand that she marry him, and when her parents refused to tell him where she had moved, he vandalized their home. Zhi also figured out that Gao was living in Mawei by following her to her boat one night when she was returning from a visit with her family. About half a year later, Gao fled to the United States out of fear that, if she remained in China, she would be forced to marry Zhi. Since

Gao left, Zhi and his cohorts have continued to harass her family, to the point where the family has had to move repeatedly.

## II. Procedural History

At her hearing, Gao testified to the events described above. In addition to Gao's testimony and a corroborating affidavit from her mother, the IJ had before her the 2001 State Department Country Report on Human Rights Practices in China ("Country Report"), which described widespread domestic violence and trafficking in brides and prostitutes. The Country Report explained that this problem is fueled by the gender imbalance that has resulted from selective abortions and infanticides of female offspring, and that the problem is worse in rural areas. The Country Report also stated that, although the central government has been trying to prevent trafficking in women, its efforts have been hampered by official corruption and by active resistance on the part of village authorities.

At the end of the hearing, the IJ issued an oral decision denying Gao asylum, withholding of removal, and CAT relief. The IJ found Gao credible, but concluded that Gao had not made out a claim for asylum or withholding of removal. Specifically, the IJ found that Gao's predicament did not arise from a protected ground such as membership in a particular social group, but was simply "a dispute between two families." The IJ also found that the record did not establish that the government would not protect her from Zhi. Finally,

the IJ found that because Gao "was able to relocate safely to another city," she did not need asylum in the United States. The IJ also, without separate analysis, denied Gao's CAT claim. The BIA summarily affirmed.

## DISCUSSION

### I. Standard of Review

■ We review *de novo* the IJ's determination of mixed questions of law and fact, as well as the IJ's application of law to facts. *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003). We review BIA interpretations of ambiguous Immigration and Nationality Act language-such as the meaning of "particular social group"-with the deference described in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We do not, however, give *Chevron* deference to summary BIA affirmances of *IJ* interpretations. *See Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 190–91 (2d Cir. 2005).[2]

■ By contrast, the scope of our review of an IJ's factual findings is narrow, and we uphold such findings so long as they are supported by "substantial evidence." *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003) (internal quotation marks omitted). The "substantial evidence" standard, however, is slightly stricter than the clear-error standard generally applied to a district court's factual findings. *Id.* at 149. We require "more than a mere scintilla" of evidence, or "such

---

**2.** This Court has not yet decided whether IJ decisions are ever entitled to a lesser form of deference: *"Skidmore* deference." *See Shi Liang Lin*, 416 F.3d at 191 (noting this open question). Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), individual agency interpretations carry persuasive power based on "the thor-

oughness evident in [their] consideration, the validity of [their] reasoning, [and their] consistency with earlier and later pronouncements." As explained below, the present case does not require us to resolve this issue because the *Skidmore* factors would not counsel deference to the particular IJ decision at issue.

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alvarado–Carillo v. INS*, 251 F.3d 44, 49 (2d Cir.2001) (internal quotation marks omitted). We also "require some indication that the IJ considered material evidence supporting a petitioner's claim." *Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir.2005); *see also Anderson v. McElroy*, 953 F.2d 803, 806 (2d Cir.1992) ("[W]e cannot assume that the BIA considered factors that it failed to mention in its decision." (internal quotation marks omitted)). It is not our role, moreover, to assume factual findings supporting denial "on the basis of record evidence not relied on by the BIA." *Jin Shui Qiu*, 329 F.3d at 149.

Applying these principles here, we review *de novo* the IJ's interpretation of the legal term "particular social group"; assume without deciding that the IJ's interpretation might be entitled to *Skidmore* deference based on its inherent persuasiveness; accord *Chevron* deference to relevant BIA precedent; and review under the "substantial evidence" standard the IJ's findings of fact as to whether Gao could have sought government protection and/or relocated within China.

## II. The Governing Law

■ To establish eligibility for the discretionary relief of asylum, a petitioner must show that she has suffered past persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion," or that she has a well-founded fear of future persecution on these grounds. *See* 8 U.S.C. § 1101(a)(42). "An alien's fear may be well-founded even if there is only a slight, though discernible, chance of persecution." *Diallo v. INS*, 232 F.3d 279, 284 (2d Cir. 2000) (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d

434 (1987)). If an applicant satisfies the higher burden of demonstrating that such persecution is more likely than not, she is automatically entitled to withholding of removal under 8 U.S.C. § 1231(b)(3). *See Diallo*, 232 F.3d at 284–85. An applicant is also entitled to CAT relief if she establishes that it is more likely than not that she would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2); *see Ramsameachire v. Ashcroft*, 357 F.3d 169, 184 (2d Cir.2004).

The three issues in this case, which we address in turn, are: 1) whether Gao established that she might be forced into marriage "on account of ... membership in a particular social group"; 2) whether the IJ had a substantial basis for finding insufficient evidence that the Chinese authorities would not protect Gao; and 3) whether the IJ had a substantial basis for finding that Gao could safely relocate within China. The government appears to concede, as it must, that forced marriage is a form of abuse that rises to the level of persecution. Moreover, as the IJ and BIA failed to address Gao's CAT claim, we simply remand that claim for consideration by an IJ or the BIA in the first instance.

## A. Particular Social Group

■ The five grounds protected under paragraph 1101(a)(42)-race, religion, nationality, membership in a particular social group, and political opinion-derive verbatim from the United Nations Protocol Relating to the Status of Refugees ("Protocol"), Jan. 31, 1967, 19 U.S.T. 6223 (entered into force Nov. 1, 1968); Congress expressly modeled its law on the Protocol so that the two would be "consistent." H.R.Rep. No. 781, at 20 (1980) (Conf.Rep.), *as reprinted in* 1980 U.S.C.C.A.N. 160, 161. Of the various categories, "particular social group" is the least well-defined on its face, and the dip-

lomatic and legislative histories shed no light on how it was understood by the parties to the Protocol or by Congress. There is, fortunately, a substantial body of case law, although its value as precedent is somewhat limited by the fact-specific nature of asylum cases.

The landmark BIA case for what can constitute a social group is *Matter of Acosta*, which, in the context of holding that Salvadoran taxi drivers were not a cognizable social group because they could change professions, set forth the following standard:

> [W]e interpret the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share *a common, immutable characteristic. The shared characteristic might be an innate one such as sex,* color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

19 I. & N. Dec. 211, 233–34 (BIA 1985) (emphasis added), *overruled in part on other grounds by Matter of Mogharrabi,* 19 I. & N. Dec. 439 (BIA 1987); *see also In re Fauziya Kasinga,* 21 I. & N. Dec. 357, 358 (BIA 1996) (recognizing as a particular social group "young women of the Tchamba–Kunsuntu Tribe who have not had [female genital mutilation], as practiced by that tribe, and who oppose the practice"); *Matter of Toboso–Alfonso,* 20 I. & N. Dec. 819, 822 (BIA 1990) (recognizing Cuban homosexuals as a particular social group); *cf. Matter of Fuentes,* 19 I. & N. Dec. 658, 662 (BIA 1988) (recognizing that former members of the Salvadoran national police could comprise a particular social group, but finding insufficient evidence of future danger).

Courts of Appeals have deferred to *Matter of Acosta*'s broad interpretation of "particular social group" as encompassing any group, however populous, persecuted because of shared characteristics that are either immutable or fundamental. In *Fatin v. INS,* 12 F.3d 1233 (3d Cir.1993), for example, then-Judge Alito writing for the Third Circuit considered and rejected a petition by an Iranian woman who had been living in Iran since before the Islamic revolution and who claimed that, if she were removed to Iran, she would be forced to conform to fundamentalist Islamic norms. *Id.* at 1235–36. The court reasoned thus:

> We believe that there are three [elements that an alien must establish in order to qualify for withholding of deportation or asylum based on membership in such a group]. The alien must (1) identify a group that constitutes a "particular social group"· within the interpretation just discussed, (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership.

In the excerpt from *Acosta* quoted above, the Board specifically mentioned "sex" as an innate characteristic that could link the members of a "particular social group." Thus, to the extent that the petitioner in this case suggests that she would be persecuted or has a well-founded fear that she would be persecut-

ed in Iran simply because she is a woman, she has satisfied the first of the three elements that we have noted. She has not, however, satisfied the third element; that is, she has not shown that she would suffer or that she has a well-founded fear of suffering "persecution" based solely on her gender.

*Id.* at 1240. The court reached this last conclusion because there was no record evidence that women in Iran were systematically persecuted *for being women. Id.* at 1241.

The *Fatin* court went on to consider Fatin's suggestion that her social group was "those Iranian women who find those laws so abhorrent that they refuse to conform-even though, according to the petitioners' brief, the routine penalty for noncompliance is 74 lashes, a year's imprisonment, and in many cases brutal rapes and death." *Id.* (internal quotation marks omitted). The court agreed that this "may well" be a cognizable social group under the asylum law but found that Fatin had not demonstrated that she was part of such a social group because she was not politically active here, testified that she would try to avoid complying with the government's dress code and other norms but not that she would take any risk necessary, and failed to establish that the new Iranian norms were abhorrent to her, as opposed to merely objectionable. *Id.* at 1241–42.

The reasoning in *Fatin* may be taken to suggest that the proper balance to strike is to interpret "particular social group"

broadly (requiring only one or more shared characteristics that are either immutable or fundamental) while interpreting "on account of" strictly (such that an applicant must prove that these characteristics are a central reason why she has been, or may be, targeted for persecution). As the Tenth Circuit explained in *Niang v. Gonzales*, "the focus with respect to [gender-related] claims should be not on whether either gender constitutes a social group (which both certainly do) but on whether the members of that group are sufficiently likely to be persecuted that one could say that they are persecuted 'on account of' their membership." 422 F.3d 1187, 1199–1200 (10th Cir.2005) (quoting 8 U.S.C. § 1101(a) 42(A)).

Other circuits have also deferred to *Matter of Acosta*'s broad definition of "particular social group." *See Hernandez–Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir.2000) (recognizing as a "particular social group" in Mexico gay men with female sexual identities, and holding "that a 'particular social group' is one united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it"); *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir.1998) (recognizing parents of political dissidents as "particular social group" under *Matter of Acosta*'s immutability test); *Ananeh–Firempong v. INS*, 766 F.2d 621, 626 (1st Cir.1985) (recognizing petitioner's family as a "particular social group").[3] Courts of Appeals have also

---

**3.** We also note that the Department of Homeland Security ("DHS") has recently taken a similar stance in *Matter of R–A–*. Initially, the BIA held, reversing an IJ, that a Guatemalan woman facing persecution on account of social group membership. 22 I. & N. Dec. 906 (BIA 1999). Then–Attorney General Janet Reno

overturned the decision, proposed new regulations for gender-related asylum claims (affirming that gender can be a sufficiently unifying characteristic), and ordered the BIA to reconsider the case after these regulations were finalized. While these regulations have not yet been finalized, DHS has since argued in a brief to the Attorney General that he

followed the BIA's holding in *In re Fauziya Kasinga*, 21 I. & N. Dec. at 358, that young women who reasonably fear customary genital mutilation are eligible for asylum under the "particular social group" rubric. *See Mohammed v. Gonzales*, 400 F.3d 785, 796–98 (9th Cir.2005); *Niang*, 422 F.3d at 1199–1200; *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir.2004). Although this Court has not had occasion to consider *de novo* whether women facing genital mutilation could comprise a "particular social group," we did find an applicant eligible for asylum based on her fear of genital mutilation in a case where the BIA *conceded* that the alleged harm was on account of Abankwah's social group but found that she had not presented sufficient proof of past or future harm. *See Abankwah v. INS*, 185 F.3d 18, 21 (2d Cir.1999); *accord Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir.2004) (noting agency concession).

The general law in our own Circuit on particular social groups is less clear. In *Gomez v. INS*, we denied the petition of a woman whose asylum claim was based on the fact that she had been raped and beaten by guerilla forces on five different occasions between the ages of twelve and fourteen. 947 F.2d 660, 664 (2d Cir.1991). Gomez argued that, because of her past, she belonged to a particular social group-"women who have been previously battered and raped by Salvadoran guerillas"-that was likely to be singled out for fur-

ther persecution. *Id.* at 663–64. In rejecting this argument, we used broad language that could (and has) been read as conflicting with *Matter of Acosta, see, e.g., Niang*, 422 F.3d at 1199. In particular, in our general statement of law, we wrote that "[p]ossession of broadly-based characteristics such as youth and gender will not by itself endow individuals with membership in a particular group." *Gomez*, 947 F.2d at 664;[4] *see also Saleh v. U.S. Dept. of Justice*, 962 F.2d 234, 240 (2d Cir.1992) (citing *Gomez*, and rejecting as potential social groups "Yemeni Moslems residing outside of Yemen" and "poor Yemenis who could not afford to pay 'blood money' to buy their way out of a death sentence [for murder]")).

■ However, in the analysis portion of *Gomez*, this Court rejected Gomez's claim not because the social group she defined was too "broadly-based" but rather because "there is no [indication] that Gomez *will be singled out* for further brutalization on [the basis of her past victimization]." 947 F.2d at 664 (emphasis added). In other words, *Gomez* can reasonably be read as limited to situations in which an applicant fails to show a *risk* of future persecution on the basis of the "particular social group" claimed, rather than as setting an *a priori* rule for which social groups are cognizable. Indeed, the former reading would appear to conform better to the BIA's reasonable interpretation of 8 U.S.C. § 1101(a)(42) in *Matter of Acosta*

should grant *R–A–* asylum under the *Matter of Acosta* standard. *See* Department of Homeland Security's Position on Respondent's Eligibility for Relief, Feb. 19, 2004, *available at* http://cgrs.uchastings.edu/documents/legal/dhs_brief_ra.pdf (visited Feb. 10, 2006). Specifically, the DHS now takes the position that "married women in Guatemala who are unable to leave the relationship" are a particular social group under the law. *Id.* at 27–28. The Attorney General remanded the case to the BIA in January 2005, *see Matter of R–A–*,

23 I. & N. Dec. 694 (AG 2005), where it is currently pending.

4. We based this statement on a formulation from the Ninth Circuit which that court has since disavowed as dicta and as inconsistent with BIA and other circuit precedent. *See Gomez*, 947 F.2d at 664 (citing *Sanchez–Trujillo v. INS*, 801 F.2d 1571 (9th Cir.1986)); *Hernandez–Montiel*, 225 F.3d at 1092–93 & n. 5 (disavowing *Sanchez–Trujillo* ).

and the consensus among the other circuits.[5]

■ We need not decide the exact scope of *Gomez* here because Gao belongs to a particular social group that shares more than a common gender. Gao's social group consists of women who have been sold into marriage (whether or not that marriage has yet taken place) and who live in a part of China where forced marriages are considered valid and enforceable.[6] Clearly, these common characteristics satisfy the *Matter of Acosta* test. Moreover, Gao's testimony, which the IJ credited, also establishes that she might well be persecuted in China-in the form of lifelong, involuntary marriage-"on account of" her membership in this group.

The IJ's reasons for reaching the opposite conclusion are unclear. The IJ recited the requirement that persecution be on account of "some immutable characteristic," yet failed to analyze whether such was the case here. The IJ appears to have concluded that Gao did not face persecution on account of an immutable characteristic because her situation arose from "a dispute between two families," but the logical connection between the IJ's premise and conclusion is not evident, nor is it explained in the IJ's opinion. The IJ also wrote that "[t]he other reason that [Gao] does not establish that she is a member of a particularly persecuted social group of female [sic] is because her mother violated the oral [marriage] contract that she had with this go-between, and that is what caused the anger by the boyfriend in this situation . . . ." To the extent the IJ might have reasoned that the financial arrangement between the *families* somehow precluded a finding that Zhi's motive in targeting *Gao* was discriminatory, we reject this logic as antithetical to the very notion of individual rights on which asylum law is based. While Zhi may have a legitimate *financial* claim against Gao's parents, the possibility remains that if they continue to be unable to repay his money, Zhi will force Gao to marry him.[7]

5. The fear of future persecution, both subjective and objective, is evaluated with respect to the specific individual who asserts that fear. To the extent that the social group of which the petitioner claims to be a member is exceptionally broad, the need for the individual to prove that he, in particular, reasonably fears being persecuted is certainly greater. This can be done either by showing that a significant portion of even the very broad group will be persecuted, or by establishing that there are good reasons for thinking that the particular alien will be singled out for persecution. The need for such proof will depend, of course, on the nature as well as the breadth of the social group, e.g., it may be readily assumed in the circumstances of a particular country that virtually every individual in a racial or ethnic group may reasonably fear future persecution, even though the group is very large.

6. To avoid unnecessary circularity or complexity, we choose this definition of Gao's group, rather than one that includes as an additional element that the individuals in question object to their compulsory marriage. Needless to say, however, if a victim ceases to object to her forced marriage and seeks United States residence purely for other reasons, then she is not, as the statute requires, "unable or unwilling to avail . . . herself of the *protection* of . . . [her country of origin] *because of* persecution or a well-founded fear of persecution." 8 U.S.C. § 1101(a)(42) (emphasis added).

We note, additionally, that our definition of Gao's social group is tailored to the facts of this case and does not reflect any outer limit of cognizable social groups. We do not here reach, for example, whether young, unmarried women in rural China comprise a "particular social group" under asylum law such that, if they have a well-founded fear of being forced into marriage, they are eligible for asylum.

7. Nor does it make any difference that Zhi is the only person likely to claim Gao as his property. The law does not distinguish between single persecutors and mobs, provided

Because the IJ's analysis of the "particular social group" issue is (to say the least) sparse, we need not reach the issue of whether *Skidmore* deference to IJ interpretations is appropriate. Even if *Skidmore* deference is appropriate, the *Skidmore* factors-"the thoroughness evident in [an official interpretation], the validity of its reasoning, [and] its consistency with earlier and later pronouncements"-do not counsel deference here. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

For the reasons stated above, we hold that Gao has established a nexus between the persecution she fears and the "particular social group" to which she belongs. The only remaining questions, therefore, are whether the IJ had a substantial basis for finding that the government was willing and able to protect Gao or that Gao could reasonably relocate within China. We address these in turn.

## B. Government Protection

■ The IJ found that Gao had not met her burden of establishing that the Chinese government would not protect her. In so finding, the IJ dismissed as "mere speculation" Gao's assertion that the government would not protect her from Zhi. We agree with Gao that this finding of fact was without substantial basis. The Country Report, which was included in the record before the IJ but which the IJ failed to mention in her opinion, states that trafficking in women, for marriage and prostitution, is widespread, and that official efforts to combat the problem have been hampered by corruption and by active resistance by village leaders. Given this evidence, together with the testimony that Zhi threatened to

have his uncle, a powerful government official, arrest Gao and with the lack of any evidence that the local officials in Gao's village *would* protect her, Gao's contention was not the least bit speculative. *See Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 342 (2d Cir.2006) ("[I]t is well established that private acts may be persecution if the government has proved unwilling to control such actions."). We therefore vacate this finding of fact.

## C. Relocation Within China

■ The IJ also found, although it is unclear whether she gave this finding significant weight, that Gao could have relocated within China because she "was able to relocate safely to another city." This finding is contradicted by the record. As set forth above, Gao testified that, six months before she fled China, she attempted to escape Zhi by moving an hour away. She further testified that Zhi continued to harass her family, vandalized their home, and even followed her when she returned home to visit and thereby succeeded in figuring out that she had moved to Mawei. Given that Gao fled China soon after Zhi made this discovery and that Zhi continued to harass Gao's parents thereafter, the record in no way suggests that Gao "was able to relocate safely." We therefore vacate this finding and remand for further consideration of this issue (should the BIA deem it a significant one).

We remind the BIA that to deny a claim based on the availability of internal refuge, the BIA must find not only that Gao could avoid persecution by relocating, but *also* that "under all the circumstances it would be reasonable to expect the applicant to do so," 8 C.F.R. § 208.13(b)(2)(ii). The regulations, further, direct the BIA to consider,

that the persecution is based on a specified ground and that the government is unable or

unwilling to protect the victim(s).

among other things, "whether the applicant would face other serious harm in the place of suggested relocation; ... administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." *Id.* § 208.13(b)(3).

## CONCLUSION

For the foregoing reasons the petition for review is GRANTED, the decision of the BIA is VACATED, and the case is REMANDED to the BIA for further proceedings consistent with this opinion. The motion for a stay of removal, previously granted, shall expire upon issuance of the mandate.