NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0420n.06
Filed: June 20, 2007

No. 05-3747

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

FJOLLA BERISHAJ,

     Petitioner,

v.

ALBERTO R. GONZALES, Attorney General of
the United States,

     Respondent.

ON PETITION FOR REVIEW OF AN
ORDER OF THE BOARD OF
IMMIGRATION APPEALS

_____/

Before:     MARTIN and CLAY, Circuit Judges; POLSTER, District Judge.[*]

     BOYCE F. MARTIN, JR., Circuit Judge.  Fjolla Berishaj petitions this Court for review the

decision of the Board of Immigration Appeals affirming the Immigration Judge's denial of her

application for asylum and associated relief.  The Immigration Judge found that Berishaj had failed

to establish that she was a member of a protected class, and further, that she had not shown she was

persecuted by the government or by someone whom the government was unwilling or unable to

control.  Because substantial evidence supports the second ground for denying Berishaj's application,

we **DENY** her petition.

_____

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of
Ohio, sitting by designation.

I.

Berishaj, an ethnic Albanian, was born in Kosovo on March 18, 1984. Berishaj left Kosovo as part of a school trip and entered the United States via a J-1 visa on or about July 3, 2002. Her authorization to remain in the United States expired on July 31, 2002, but Berishaj stayed behind when her school group departed. On August 1, 2003, she was served with a notice to appear before an Immigration Judge (IJ) and show why she should not be removed from the United States for overstaying her visa. On October 10, 2003, Berishaj, through counsel, filed an application seeking asylum, withholding of removal, and relief under the Convention Against Torture.

The following facts were presented by Berishaj in her application for asylum and her testimony before the IJ. Because the IJ found Berishaj to be "entirely credible," we must accept these facts as true. *See Gilaj v. Gonzales*, 408 F.3d 275, 285-86 (6th Cir. 2005).

On her application for asylum, Berishaj claimed asylum based on membership in a particular social group. She recounted abuse at the hands of the man to whom she had been engaged by virtue of an agreement between her father and her fiancé's family. On the same form, Berishaj also explained that she could not return to Kosovo because the man to whom she was engaged "must fulfill the oath he made to the council of elders . . . to kill me for shaming him and his family."

The IJ conducted a hearing on January 29, 2004. Berishaj testified as the sole witness on her behalf and did not provide any documentation from other witnesses, such as letters from her family or friends. According to Berishaj, in late May or early June of 2001, her father entered into an arrangement with the family of Orhan Ademi. Two or three weeks earlier, the Ademi family had come to the Berishaj residence and proposed a transaction to Mr. Berishaj by which he would trade

his daughter to Ademi as Ademi's fiancé in exchange for a piece of property. Berishaj was officially engaged to Ademi on June 16, 2001. She was seventeen and Ademi was twenty-five. The arrangement presupposed a June 2003 wedding, at which point Berishaj would be finished with high school. Berishaj, despite her opposition to the transaction, had no say in the matter.

Berishaj first met Ademi in September 2001, when he was waiting for her one day outside her school. Ademi introduced himself by demanding that Berishaj "come here" because she was going to be his wife. Thereafter, Ademi would regularly come to Berishaj's school and wait outside for her. When he eventually deduced that Berishaj had no desire to talk to him, Ademi began to accost Berishaj, pushing and grabbing her, calling her names like "bitch" and "prostitute," and swearing at Berishaj's family. Berishaj did not respond to Ademi's behavior. As Berishaj became increasingly opposed to the engagement, she confided this fact to her mother, who, despite being sorry for Berishaj, told her that she had no choice because her father had given his word to Ademi. Berishaj explained at the hearing that her community lived pursuant to a separate set of laws under the ancient Code of Kanun. Under the Code of Kanun, Mr. Berishaj faced punishment by the community elders if he broke his word, and he would have to leave the community as a result.

Berishaj testified that from fall 2001 to winter 2002, Ademi's actions were "getting worse every day" as she continued to reject him. For example, one day in January, while she and her two younger brothers were at home alone, Ademi came to the house and tried to force his way in. Although Berishaj attempted to bar the door, Ademi pushed his way partially through the door and punched Berishaj in the left cheek with his fist leaving a visible bruise that lasted about a week. When Berishaj screamed, her fifteen-year-old brother came to the door, and Ademi left. When her

parents arrived back home, Berishaj told her mother about the incident, and although she did not explicitly tell her father, Mr. Berishaj saw the bruise on Berishaj's face and deduced what had happened. Mrs. Berishaj asked her husband to reconsider the arrangement, which led to a "really bad fight" between Mr. and Mrs. Berishaj. Mr. Berishaj, thinking the incident was "not a big deal," refused to allow Berishaj to see a doctor for her injuries. Berishaj claimed that she was not allowed to go to the police to report the battery, because to do so would humiliate her father. Additionally, Berishaj testified that even if she did report the battery to the police, she believed they would do nothing because "they all do that . . . they all hit their wives."

On February 9, 2002, Berishaj and two school friends headed to a bookstore in downtown Pristina, the capital city of Kosovo. Although the streets were filled with people, Ademi followed the girls in his car, shouting insults at Berishaj. At one point, Ademi stopped the car and the matter escalated; he started screaming that he was going to rape and kill her, and then he exited the car and accosted Berishaj. Ademi tried to force Berishaj into his car, but she resisted. Enraged, Ademi again punched Berishaj in the face with his fists, this time causing her to fall to the ground. Ademi continued to scream threats and insults at Berishaj. Although Berishaj's two friends tried to help her, no bystanders made any attempt to intervene.

As a crowd gathered, the police approached to see what was happening. Without ever talking with Berishaj, who was lying on the ground crying, the police talked with Ademi and then took him to the police station. The police did not handcuff Ademi, nor did they ever acknowledge Berishaj. By the time Berishaj arrived home, Ademi's parents had already called her father to inform him of the incident. Berishaj testified that her father was extremely angry at her and took it out on his wife.

The next day, a letter arrived for Mr. Berishaj, inviting him to accompany his daughter to court.  On the way to court, Mr. Berishaj told his daughter to say that everything was okay, and that the whole thing was just an accident.  Before the judge heard Berishaj's testimony, he told her that "every Albanian woman gets hit by the husband."  According to the court document, Ademi testified before the judge: "It's true that I slapped Fjolla Berishaj in a public place, because she didn't want to see me anymore and she was not interested in our relationship.  I'm serious in getting engaged and marry her and I'll not stop persuing [sic] seriously about this matter."  Notwithstanding her father's instructions, Berishaj gave a truthful account of the incident to the judge.  As a result of the testimony, Ademi was convicted of violating a public order law and fined 250 euros as punishment.[1]

Berishaj testified that Ademi was humiliated by the fact that he had been publicly punished for beating Berishaj, and he felt that he was not "man enough" in the eyes of the townspeople.  Under the Code of Kanun, because Ademi had been humiliated and shamed by Berishaj, he would "really have to do something to come clean" in the eyes of the community's elders, who had the final decision on what could be done to restore Ademi's lost honor.  Ademi increased his threats to Berishaj, and his friends would accost Berishaj outside her school and tell her to "count my days because he's going to kill me."  Berishaj took these threats seriously, as did her mother.  Berishaj felt that she could not relocate elsewhere in Kosovo (nor in neighboring Montenegro, Albania, or Macedonia, for that matter) because of the largely interconnected nature of the ethnic Albanian

---

[1]According to the translated court document, the judge fined Ademi in lieu of sending him to prison for sixteen days due to his family's economic circumstances.  (He was responsible for providing food for his parents, younger sisters, and others.)  The translated document also states: "instead of going to jail he just have [sic] to pay the fine, with reasoning that this fine, it's going to be a positive effect of the sanction, so the defendant doesn't have to do such infraction in the future."

population in the entire region. Ethnic Albanians fled Kosovo as refugees during the ethnic cleansing campaigns in the 1990s, and thus, according to Berishaj, people in other Balkan countries "knew each other" and always had connections to others. Berishaj approached her mother with the idea of participating in a school-sponsored trip to the United States. She did not ask her father, for she was afraid that he would refuse his permission and even forbid her from attending school any longer. Mrs. Berishaj contacted her sister-in-law, who lives in Michigan, and she agreed to help. Mrs. Berishaj made the decision that her daughter would participate in the trip, unbeknownst to anyone else in the family. When Berishaj left her house on the morning of June 28, 2002, she did so under the pretense that she was taking some books over to a friend's house. She took only her backpack and said goodbye to no one, not even her mother, for fear that the trip would be discovered.

Berishaj spoke with her parents sometime after arriving in the United States. She testified that her father told her that after she fled, Ademi had sworn a blood oath in front of the elders that he would kill Berishaj. Although the engagement has been broken, the elders approved Ademi's blood oath as the proper way to restore his shamed honor. The elders instructed that until his honor is restored, Ademi cannot live in the area, he cannot get married or have a family, or find employment. Berishaj stated that as recently as two months before the IJ's hearing, two friends still living in Kosovo told her that Ademi continues to threaten her life. Berishaj believes that she cannot rely on the police to help her, because the police and their families face repercussions if they get involved in matters of honor under the Code of Kanun, and that the international peacekeepers do not intervene in such matters, as they are focused solely on keeping the peace in Kosovo between ethnic Albanians and Serbs. Consequently, Berishaj claims that she is afraid that Ademi is

compelled under the Code of Kanun to complete that which he has sworn a blood oath to do, and that he will not stop until he kills her.

After the conclusion of Berishaj's testimony, the IJ entered an oral order denying Berishaj's applications, and ordering her removal from the United States. In the order, the IJ stated: "the Court finds that [Berishaj's] testimony has been consistent and entirely credible." Nevertheless, the IJ found that Berishaj had not established that she was eligible for asylum under the Immigration and Nationality Act (INA) because "she has not established that she falls within one of the protected grounds." Furthermore, the IJ continued, even if she had established that she fell within one of the protected grounds, Berishaj could not establish that her persecution "would be at the hands of the government or someone who cannot be controlled by the government." Berishaj appealed to the Board of Immigration Appeals (BIA), which affirmed the IJ's ruling without opinion in an order issued May 23, 2005. She now petitions this Court to review the decision of the BIA.[2]

## II.

We have jurisdiction to review the BIA's final order of removal pursuant 8 U.S.C. § 1252(a)(1). When the BIA affirms the decision of the IJ without issuing an opinion, we review the decision of the IJ directly. *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005). Because the IJ found Berishaj to be credible, we need only review the IJ's determination that Berishaj was not eligible for asylum or withholding of removal.

---

[2]Berishaj does not appeal the IJ's decision denying relief pursuant to the Convention Against Torture. She thereby waives that appeal. *See Shkabari v. Gonzales*, 427 F.3d 324, 327 n.1 (6th Cir. 2005).

A. Asylum

The Attorney General has discretionary authority to grant asylum to refugees. 8 U.S.C. § 1158(b)(1). The IJ must first determine whether the applicant qualifies as a refugee, and then decide "whether the applicant merits a favorable exercise of discretion by the Attorney General." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003). A refugee is someone unwilling or unable to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In order for the harm suffered by an applicant to constitute persecution, it must have been inflicted by the government of the home country, or by someone whom the government is unwilling or unable to control. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citing *In re Kasinga*, 21 I. & N. Dec. 357, 365 (BIA 1996)). It is the applicant's burden to prove she qualifies as a refugee. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (citing 8 C.F.R. § 208.13(a)-(b)). Where an applicant has demonstrated past persecution, there is a presumption of future persecution. *Id*. The government can rebut this presumption by establishing by a preponderance of the evidence that the home country's conditions have changed such that the applicant no longer has a well-founded fear of persecution upon her return. *Id*.

We review an IJ's decision that an applicant is ineligible for asylum under the substantial evidence standard. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). An IJ's factual determinations will not be reversed "unless we find 'that the evidence not only supports a contrary conclusion, but *compels* it.'" *Id*. (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004)). *See also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (providing that the IJ's rulings should be

upheld if "supported by reasonable, substantial, and probative evidence on the record considered as

a whole").

The IJ found that Berishaj is ineligible for asylum because she does not fall within one of the

protected grounds, and even if she does, she has not established that the government, or someone

whom the government is unwilling or unable to control, persecuted her. Although we are

unconvinced with respect to the first ground, we hold that substantial evidence supports the second

ground for denying Berishaj's application for asylum.[3]

---

[3]In determining whether Berishaj falls within a protected ground, the entirety of the IJ's conclusion is as follows: "While the Court sympathizes with the respondent's claim and with her fears, the Court finds that she has not established that she falls within one of the protected grounds." The IJ provided no legal analysis or any reasoning whatsoever to support her conclusion. Moreover, the IJ failed to even identify which of the five protected grounds she considered. Yet at the hearing, Berishaj, through her counsel, stated that "[h]er particular social group is a woman who is not willing to go through a forced marriage." As such, the IJ should have first identified the protected ground Berishaj contended she falls under (particular social group), and then discussed why Berishaj had failed to demonstrate her membership in this group. In light of the IJ's unsupported conclusion, were Berishaj's membership in a particular social group the only ground for denying her application, we would remand her case. *See Gonzales v. Thomas*, 126 S. Ct. 1613, 1615 (2006) (holding that where the IJ fails to make a proper inquiry and support its conclusions with analysis and reasoning, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *see also Wu v. Gonzales*, No. 05-3939, 2007 U.S. App. LEXIS 1833, *7-8 (6th Cir. Jan 26, 2007) (unpublished) ("[W]here . . . a reviewing court cannot sustain an agency decision because the agency has failed to consider a legal issue central to resolution of the petitioner's claims, the appropriate remedy is remand to the agency for further consideration) (citing *INS v. Ventura*, 537 U.S. 12, 16-17 (2002)).

Notably, in a factually-similar case, the Second Circuit vacated the BIA's affirmance of the IJ's denial of an applicant's asylum claim where the applicant had suffered persecution on account of her membership in a particular social group — women who have been sold into marriage. *See Gao v. Gonzales*, 440 F.3d 62, 70 (2d Cir. 2006) (finding that (1) Gao belonged to a particular social group consisting of women who have been sold into marriage (regardless of whether the marriage has taken place); (2) Gao lived in a part of China where forced marriages are valid and enforceable; and (3) based on her testimony, which the IJ deemed credible, she established she would suffer persecution on account of her membership in the group). While Gao's case may have been stronger than Berishaj's, we believe that such decisions are best left to an IJ to decide in the first instance "on

As the IJ correctly pointed out, any harm suffered by Berishaj was not at the hands of the government, as Ademi was not a member or employee of the government. However, whether the government was unwilling or unable to control Ademi is a closer question. In support of her finding that the government was not unwilling or unable to protect Berishaj, the IJ explained that when Ademi hit Berishaj in Pristina on February 9, 2002, the police took him away, and "[a] court case was started against him and he was convicted of assault and punished," although she did note that Ademi's punishment was "minimal." According to a translated court document from that conviction, Ademi slapped Berishaj in the face and stated "I'll kill you. I'll never let you get another man, but me in your life." The document that states that "[t]his is an infraction of Article 18, Paragraph 1, Point 5 of Public Order Law and for this he gets penalized[.]"

We realize that the wording in the court document could be read to focus on the physical location of the disturbance, rather than the fact that Ademi hit Berishaj, and thus we wonder whether Ademi was simply penalized for creating a public disturbance. For example, the translated court document states that Ademi testified that he "slapped Fjolla Berishaj in a public place." And notably, although the judge imposed a 250 euro fine in lieu of a sixteen day jail sentence, the 2002 Country Report for the Federal Republic of Yugoslavia and the 2003 Country Report for Serbia and Montenegro both state that the applicable penalties for domestic abuse of women "include

---

a case by case basis," *id*. at 67 (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)). *See id.* at 70 n.6 ("We note, additionally, that our definition of Gao's social group is tailored to the facts of this case and does not reflect any outer limit of cognizable social groups.").

incarceration for periods of 6 months to 5 years."[4]  Also, we find the judge's comment that "every Albanian woman gets hit by the husband" to be more than a bit troublesome.

But despite our doubts regarding the underlying crime for which Ademi was punished, the IJ's interpretation of the court document—that Ademi was penalized for hitting Berishaj—is entirely plausible.  Significantly, the translated court document states that the police "filed the *battery and assault* case number . . . to start the infraction procedure against [Ademi]."  (Emphasis added.) Further, it appears that Ademi was convicted for only slapping Berishaj, which may not rise to the level of "domestic abuse" as provided in the Country Reports.  Plus, Ademi appears to have been prosecuted under the local laws in Pristina, so it is not terribly helpful to compare Ademi's sentence to the sentence provided in the Country Reports.  And presumably this was Ademi's first offense, which may have resulted in a more lenient sentence.  Although the judge's tasteless comment to Berishaj demonstrates he was not sympathetic to her plight, the record suggests that he was still willing to punish Ademi.  Based on the evidence before her, the IJ concluded that the government of Kosovo was willing and able to protect Berishaj.  While the evidence *may* support the conclusion that Ademi's conviction was not based directly on his assault of Berishaj, we cannot say that it *compels* this conclusion.  *See Ramaj*, 466 F.3d at 527.  In light of the extremely deferential standard of review to which we must adhere, we hold that substantial evidence supports the IJ's conclusion that the government was not unwilling or unable to control Ademi.

---

[4]*See* U.S. Dep't of State, Country Reports on Human Rights Practices for the Federal Republic of Yugoslavia (2002), *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18401.htm; U.S. Dep't of State, Country Reports on Human Rights Practices for Serbia and Montenegro (2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27874.htm.

We also note that Berishaj may have been able to satisfy her burden by presenting evidence that her community adhered to the Code of Kanun, and that the government was aware of this fact but did nothing to prevent it. However, even though the IJ apparently thought Berishaj's testimony regarding the presence of the Code of Kanun in her community was credible, there was no evidence in the record establishing that the government was unwilling or unable to overrule the Code where necessary. *Cf. Fiadjoe v. AG*, 411 F.3d 135, 160-61 (3d Cir. 2005) (holding that where the applicant's father enslaved and abused her in accordance with the tenets of the Trokosi religion, the BIA's determination that the Ghanaian government was either unwilling or unable to control him was *not* supported by substantial evidence because the BIA ignored evidence in the record establishing the deep hold the Trokosi religion had upon many Ghanian people).

### B. Withholding of Removal

The IJ also denied Berishaj's request for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3). An applicant may be granted withholding of removal if she establishes a "clear probability of persecution" by presenting evidence showing that if she returns to her home country, it is "more likely than not" that she will be persecuted on account of her race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407, 424 (1984); *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004). Thus, a claim for withholding of removal carries a more stringent burden of proof than does a claim for asylum. Because Berishaj failed to meet the burden of proof to establish eligibility for asylum, she cannot meet the higher burden of proof for withholding of removal. *Mullai*, 385 F.3d at 639.

III.

This is a sympathetic case indeed. However, asylum law does not provide relief to an applicant alleging persecution unless she can show some nexus to governmental acts or omissions. Therefore, we **DENY** Berishaj's petition for review.

**POLSTER, District Judge,** concurring in part and dissenting in part. I concur in that portion of the majority opinion holding that the Immigration Judge's conclusion that Berishaj does not fall within one of the protected grounds for asylum is not supported by any legal analysis or reasoning. Where I must part company with the majority is its holding that there is substantial evidence to support the IJ's conclusion that Berishaj has not established that she was persecuted by someone whom the government is unwilling or unable to control. While it is true that the government prosecuted Ademi for publicly assaulting Berishaj after she had endured at least two prior beatings and repeated threats, the facts surrounding Ademi's trial compel the conclusion that the government was and is unwilling or unable to protect Berishaj from future attack.

There is no dispute about the facts, as the IJ found that Berishaj was "entirely credible." She testified that Ademi's trial began with the judge commenting that "every Albanian woman gets hit by the husband." It was certainly reasonable for Ademi to conclude that his infraction was not a serious one in the eyes of the court, so he tested that assumption. After conceding that he slapped Berishaj in public because she didn't want to see him anymore and was not interested in their relationship, he told the judge: "I'm serious in getting engaged and marry her and I'll not stop persuing [sic] seriously about this matter."[5]

I know what I would have done had a defendant in a similar situation flouted the law in this fashion; I would have responded by imposing a stiff jail sentence, coupled with a warning about even harsher consequences should there be any further incidents, and I cannot imagine any reasonable

---

[5] The court document also states that when Ademi slapped Berishaj in the face, he stated, "[You] filthy prostitute, I'll kill you. I'll never let you get another man, but me in your life."

judge in any country who would not have responded in the same way to Ademi's declarations to the court. The fact that the judge presiding over Ademi's case said nothing whatsoever in response to Ademi's statements, and then imposed only a fine on Ademi, sent an unmistakable signal to both Ademi and Berishaj that the Kosovo courts would not protect Berishaj from future attacks, and that the Code of Kanun was more potent than Kosovo law.

Ademi's conduct <u>after</u> his court hearing and conviction provide additional evidence that Ademi, undeterred by his sentence, intends to flout Kosovo law in favor of the dictates of the Code of Kanun and therefore that the government of Kosovo is unable or unwilling to protect Berishaj from private persecution at Ademi's hands. In the aftermath of Ademi's conviction, his friends began publicly threatening to kill Berishaj, frequently making such threats to Berishaj personally at her school. Ademi also called Berishaj daily on the telephone, threatening that he was going to rape and kill her. Berishaj justifiably feared for her life at that point, and fled the country, with the help of her mother and an aunt who lives in Michigan. Additionally, Berishaj testified that she spoke with her parents after fleeing to the United States, and learned that Ademi had publically sworn a blood oath in front of the village elders that he would kill Berishaj. The elders approved Ademi's blood oath as the only proper way to restore his shamed honor under the Code of Kanun. Critically, Ademi must carry out his blood oath under the Code; until his honor is restored, Ademi cannot live in the area, he can't get married or have a family, or find employment. As recently as two months before the IJ's hearing, two friends still living in Kosovo told Berishaj that Ademi continued to threaten her life. All of the evidence Berishaj presented compels me to conclude that the government of Kosovo is unable or unwilling to protect Berishaj from persecution at Ademi's hands.

I am mindful of the deferential standard of review in this case. In accordance with the "substantial evidence" standard, however, I find that Berishaj has met her burden of demonstrating that the Kosovo government is unable or unwilling to protect her from Ademi, and her evidence compels the conclusion that the IJ's decision to the contrary is not supported by substantial evidence. Accordingly, I would **REVERSE** on the issue of private persecution, and **REMAND** for a determination of whether Berishaj falls within one of the protected grounds for asylum.