**Eldin Jacobo ESCOBAR, Petitioner**

v.

**Alberto GONZALES,\* Attorney General of the United States, Respondent.**

No. 04–2999.

United States Court of Appeals, Third Circuit.

Argued May 4, 2005.

July 28, 2005.

Steven D. Gordon, (Argued),** Holland & Knight LLP, Washington, D.C., for Petitioner–Appellant.

John C. Cunningham, (Argued), Senior Litigation Counsel, Peter D. Keisler, Assistant Attorney General, Civil Division, Linda S. Wendtland, Assistant Director, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Ben Franklin Station, Washington, D.C., for Respondent–Appellee.

Before MCKEE, VAN ANTWERPEN and WEIS, Circuit Judges.

## OPINION

WEIS, Circuit Judge.

The issue in this appeal is whether, under the Immigration and Nationality Act, Honduran "street children" constitute a "particular social group" whose members can seek asylum and withholding of removal based on their persecution or a well-founded fear of persecution in their home country. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(a), 1231(b)(3). We conclude that Honduran street children are not a particular social group within the terms of the Act and therefore we will deny the Petition

for Review of the Board of Immigration Appeals.

Petitioner, Eldin Jacobo Escobar, is a native of Honduras. Escobar's parents abandoned him at an early age, and he was forced to share a small house with his maternal grandparents and other relatives in the Department of Olancho. The group lived under crude conditions, lacking a bathroom, heat and beds. While he was living with his extended family, Escobar's grandfather and uncles physically abused him.

When he was approximately nine years old, Escobar ran away and began living on the streets of Honduran cities and villages. He earned tips doing various jobs including shining shoes and selling fruit or clothing. He slept in many different places and often went shoeless in tattered clothing.

In addition to enduring the general tribulations of street living, Escobar asserts that members of various Honduran street gangs stole from him, threatened him with violence and physically abused him. He alleges that he observed similar attacks, some of which were fatal, on other street children. Gang members told Escobar to rob and steal for and with them, and repeatedly pressured him to join their gangs.

Escobar contends that the Honduran police failed to offer protection to street children. He testified that, like gang members, the police officers pressured him to steal on their behalf, and threatened him if he refused.

After enduring harsh treatment on the streets of Honduras, Escobar fled to Mexico and lived on the streets there. He eventually contacted his mother who was living in the United States and met her in Tijuana.[1]

** We acknowledge our appreciation for the excellent briefing and oral argument presented by the petitioner's counsel acting *pro bono* in the highest tradition of the profession.

1. Escobar's mother had Temporary Protected

When Escobar's mother brought him into the United States in October 2001, he was thirteen years old. He was not inspected or admitted by an immigration officer at his point of entry. The record of Escobar's activity in this country is sparse, but he eventually lived in Texas with a relative until he was taken into custody by the former INS in March 2003.

After a hearing on Escobar's claims for asylum and withholding of removal, an Immigration Judge issued a decision in January 2004. The IJ concluded Escobar's claims for asylum and withholding of removal were based on membership in a cognizable social group comprised of "abandoned street children in Honduras who are targets of systemic violence generated by government officers and non-governmental groups and from which the Honduran government has provided grossly inadequate protection." However, the IJ denied Escobar's claims for lack of credibility.

■ The Board of Immigration Appeals held that, even if Escobar testified credibly, "Honduran street children" did not constitute a "particular social group for purposes of asylum and withholding of removal." On appeal to this Court, Escobar challenges the BIA's decision, contending that homeless Honduran street children constitute a "particular social group." We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). *See Abdulai v. Ashcroft*, 239 F.3d 542, 548 (3d Cir.2001). We review legal determinations by the BIA *de novo*. *Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir.2004).

· I.

■ The Immigration and Naturalization Act provides that certain aliens are eligible for asylum if they are refugees as that term is defined in 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158. A refugee is a person who is unable or unwilling to return to his or her home country because of a well-founded "fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Withholding of removal is similarly reserved for aliens whose life or freedom would be threatened in their home country because of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231.

The phrase "particular social group" was incorporated into the INA when Congress enacted the Refugee Act of 1980. As we observed in *Fatin v. INS*, 12 F.3d 1233 (3d Cir.1993), "Congress intended 'to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees to which the United States acceded in 1968.'" *Id.* at 1239 (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 436–37, 107 S.Ct. 1207, 94 L.Ed.2d 434(1987)) (citation omitted).

The Protocol defined "refugee" using the terms "race, religion, nationality, membership of a particular social group or political opinion." *Fatin*, 12 F.3d at 1239. The phrase "membership of a particular social group" received no significant elaboration in the Protocol beyond a notation that "experience had shown that certain

Status in the United States. Honduras has been designated as a "special circumstances" country whose nationals are able to remain in the United States as a result of the damage that country suffered following Hurricane Mitch. Unlike his mother, petitioner is not eligible for Temporary Protected Status because it is only available to those Honduran nationals who have resided in the United States continuously since December 30, 1998. *See* 69 Fed.Reg. 64,087.

refugees had been persecuted because they belonged to particular social groups." *Id.*

The statutory language standing alone is not instructive and read literally "is almost completely open-ended." *Id.* Although the scant legislative and Protocol history provides little information about the underlying reasons for the inclusion of the phrase "particular social group" in the INA's definition of a refugee, one other source is available—the INS interpretation. As the Supreme Court observed in *INS v. Abudu*, 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988):

> "INS officials must exercise especially sensitive political functions that implicate questions of foreign relations, and therefore the reasons for giving deference to agency decisions ... in other administrative contexts apply with even greater force in the INS context."

The Court again recognized that policy in *INS v. Aguirre–Aguirre*, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999), pointing out that the judiciary is "not well positioned to shoulder primary responsibility for assessing the likelihood and importance" of diplomatic repercussions.

In *Fatin*, we looked to the BIA's interpretation of "particular social group" in *Matter of Acosta*, 19 I. & N. Dec. 211, 1985 WL 56042 (BIA 1985), *overruled on other grounds by, In re Mogharrabi*, 19 I. & N. Dec. 439, 1987 WL 108943 (BIA 1987). *Fatin*, 12 F.3d at 1239–40. The BIA reasoned that a particular social group refers to "a group of persons all of whom share a common, immutable characteristic." *Acosta*, 19 I. & N. at 233. Further, the Board commented:

> "The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land own-

ership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences."

*Id.*

*Fatin* concluded that the Board's construction of "particular social group" in *Acosta* was reasonable and adopted it. Applying that construction, we concluded that the alien's particular social group "consisted of Iranian women who [found] their country's gender-specific laws offensive and [did] not wish to comply with them." *Fatin*, 12 F.3d at 1241. However, because the alien failed to establish persecution, relief was properly denied. *Id.* at 1243.

The difficulty of discerning the contours of particular social groups was an issue in *Lukwago v. Ashcroft*, 329 F.3d 157 (3d Cir.2003). There we observed that the Courts of Appeals of the First and Seventh Circuits had also adopted the *Acosta* formula. *Lukwago*, 329 F.3d at 171. The Sixth Circuit has as well. *Castellano–Chacon v. INS*, 341 F.3d 533 (6th Cir.2003). The Second and Ninth Circuits use variations of the definition. *See Gomez v. INS*, 947 F.2d 660, 664 (2d Cir.1991); *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986).

*Lukwago* refused to accept "children" as a particular social group representing as it does an "extremely large and diverse" group. 329 F.3d at 172. We did, however, decide that "membership in the group of former child soldiers who have escaped LRA [2] captivity fits precisely within the

---

**2.** The "Lord's Resistance Army," an anti-government group in Uganda that employs mur-

der, rape and kidnaping in pursuit of its aims.

BIA's own recognition that a shared past experience may be enough to link members of a 'particular social group.'" *Id.* at 178.

In interpreting such an amorphous phrase as "particular social group," it is somewhat helpful to review representative rulings by other forums on that subject. Courts have excluded from the classification: young, urban El Salvadoran males of military age who had not served in the military, *Sanchez–Trujillo v. INS,* 801 F.2d 1571 (9th Cir.1986); youths with gang identification tattoos, *Castellano–Chacon v. INS,* 341 F.3d 533 (6th Cir.2003); voluntary members in a taxi cab cooperative that refused to yield to guerrillas, *Matter of Acosta,* 19 I. & N. Dec. 211 (1985); and adult women raped and brutalized as children in El Salvador, *Gomez v. INS,* 947 F.2d 660 (2nd Cir.1991).

Courts have recognized the following social groups: a family targeted for harassment and violence because they were related to an allegedly racist boss in South Africa, *Thomas v. Gonzales,* 409 F.3d 1177 (9th Cir.2005); children with "disabilities that are serious and long-lasting or permanent in nature and parents who care for them," *Tchoukhrova v. Gonzales,* 404 F.3d 1181, 2005 WL 913449 (9th Cir.2005); Somali women under threat of genital mutilation, *Mohammed v. Gonzales,* 400 F.3d 785 (9th Cir.2005); a familial sub-clan in Somalia, *In re H–, Applicant,* 21 I. & N. Dec. 337 (BIA 1996); and former members of El Salvador's national police, *Matter of Fuentes,* 19 I. & N. Dec. 658 (BIA 1988).

These cases from other forums lead to the conclusion that membership in a "particular social group" can be attributed to either: (1) those who possess immutable characteristics such as race, gender or a prior position, status or condition; or (2)

those who possess a characteristic that is capable of being changed but is of such fundamental importance that individuals should not be required to modify it, e.g., religion.

In *Fatin* we considered the latter type of group classification. We indicated that the particular social group might be defined as women who refused to comply with Iranian gender-specific laws to the extent that they would suffer severe sanctions for their noncompliance. *Fatin,* 12 F.3d at 1241. In that situation, the characteristic of the group would be that the members' beliefs were so fundamental that they ought not be required to change them.

As we pointed out in *Lukwago,* the social group must exist as such and the persecution must be on account of a protected ground, but the persecution cannot be what defines the contours of the group. *Lukwago,* 329 F.3d at 172. Past persecution of itself does not define the group. Nor is youth alone a sufficient permanent characteristic, disappearing as it does with age. *Id.*

Here we are confronted with a situation in which there are three main elements of Escobar's claimed social group: poverty, homelessness and youth. It may well be conceded that young individuals from Honduras face extremely depressing, bleak prospects. But the record fails to show any realistic differences between these children and those of Guatemala or Sao Paulo or hundreds of other locations across the globe. Incidents of deprivation and suffering are, unfortunately, universal and not confined to one country. Thus a legitimate distinction cannot be made between groups of impoverished children who exist in almost every country.

Some governments may devote more of their assets to alleviate the conditions of street children, but the record does not contain evidence to support a finding that Honduras is significantly more derelict than others in the developing world. Testimony at the hearing before the IJ in this case established the insufficiency of resources to aid the street children in Honduras. The country reports prepared by the U.S. Department of State document the adverse living conditions Honduran street children must endure.[3]

As we commented in *Fatin*, the phrase "particular social group" is almost completely open-ended. *Fatin*, 12 F.3d at 1238. That appraisal applies to the particular group Escobar claims here. Poverty, homelessness and youth are far too vague and all encompassing to be characteristics that set the perimeters for a protected group within the scope of the Immigration and Naturalization Act. The lack of an outer limit counsels against a designation that would appear to be contrary to congressional intent.

The situation indeed is one appealing to sympathy and compassion, but in construing the Refugee Act of 1980, we are limited by both the traditional deference owed to Congress and the executive branch in matters of immigration.

Unlike procedural due process in immigration proceedings, an area in which the Courts may assert some expertise, the choice of those aliens who shall be permitted to enter or remain in the country is a matter of policy within the special competence of the legislative and executive branches. An illustration of the flexibility and delicate balancing necessary for those determinations is presented in this case where certain Honduran nationals were granted temporary protected status in this country because of the ravages of Hurricane Mitch.

We will deny the Petition for Review.

---

3. The 2002 country report, as well as more recent country reports on Honduras, may be found at http:\\www.state.gov\g\drl\rls\hrrpt\2004\41765.htm.