

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-5-2009

# Vasquez-Ramirez v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2999

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

## Recommended Citation

"Vasquez-Ramirez v. Atty Gen USA" (2009). *2009 Decisions.* Paper 1776.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1776

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-2999

FELIX ALFONSO VASQUEZ-RAMIREZ,
Petitioner

v.

ATTORNEY GENERAL USA,
Respondent

Petition for Review of an Order of the
Board of Immigration Appeals
(A05-902-646)

Submitted pursuant to Third Circuit LAR 34.1(a)
October 30, 2008

Before: McKEE, NYGAARD, *Circuit Judges*,
and SILER,[*] *Senior Circuit Judge*.

(Opinion filed: March 5, 2009)

OPINION

McKEE, *Circuit Judge*.

Felix Alfonoso Vasquez-Ramirez petitions for review of an order of the Board of

Immigration Appeals affirming a decision of an Immigration Judge that denied his

---

[*]The Hon. Eugene E. Siler, Jr., Senior Circuit Judge of the United States Court of
Appeals for the Sixth Circuit, sitting by designation.

1

applications for asylum and withholding of removal.[1]  For the reasons that follow, we will

---

[1]The Attorney General has discretion to grant asylum to a removable  alien. *See* 8 U.S.C. § 1158(b)(1)(A).  However, that discretion can only be exercised if the alien first establishes that he/she is a "refugee." *Id.*  A "refugee" is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).    The asylum applicant must present some evidence that removal will result in persecution "on account of" one of the five statutory grounds in order to establish eligibility for asylum. *INS v. Elias-Zacarias*, 502 U.S. 478 (1992).

An applicant who offers credible testimony regarding past persecution is presumed to have a well-founded fear of future persecution. *Berishaj v. Ashcroft*, 378 F.3d 314, 323 (3d Cir. 2004) (citation omitted).   The "well-found fear of persecution" standard involves both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987).   The subjective prong requires a showing that the fear is genuine. *Mitey v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995).  Determination of an objectively reasonable possibility requires ascertaining whether a reasonable person in the alien's circumstances would fear persecution if returned to a given country. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir. 2003) (citation omitted).

"To satisfy the objective prong, a petitioner must show he or she would be individually singled out for persecution or demonstrate that 'there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)).  Although INA regulations do not define "pattern or practice," we have held that "the persecution of the group must be systematic, pervasive, or organized," to constitute a pattern or practice. *Id*. (citation omitted).  "In addition, as with any claim of persecution, the acts must be committed by the government or forces the government is either unable or unwilling to control." *Id*. (citation omitted).

Withholding of removal is mandatory once "the Attorney General decides that

(continued...)

deny the petition for review.

## I.

Ramirez is a native and citizen of Colombia. On January 17, 2002, he entered the United States on a non-immigrant B2 visa which authorized him to stay until July 16, 2002. He remained in the United States after his authorized stay expired, but he filed an application with the Bureau of Citizenship and Immigration Services for asylum, withholding of removal, and protection under the ConventionAgainst Torture ("CAT"). His application was based on his claim that he had been persecuted by the Revolutionary Armed Forces of Colombia ("FARC").[2] "FARC is a leftist guerilla group that originally was established to serve as the military wing of the Colombian Communist Party." *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 668 (7th Cir. 2005). He also sought voluntary departure. Ramirez was interviewed by an asylum officer, who concluded that his fear of harm was not "on account of" a statutorily protected ground. As a result, the former INS served Ramirez with a Notice to Appear ("NTA"), alleging that he was removable pursuant to 8 U.S.C. § 1227(a)(1)(B), because he overstayed his visa.

---

[1](...continued)
[the] alien's life or freedom would be threatened" because of a protected trait or activity. 8 U.S.C. § 1231(b)(3)(A). To obtain that relief, an alien must establish a "clear probability," i.e., that it is more likely than not, that he/she would suffer persecution. *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Because this standard is higher than that governing eligibility for asylum, an alien who has failed to satisfy the standards for asylum is necessarily ineligible for withholding removal. *Zubeda*, 333 F.3d at 469-70.

[2] "FARC" stands for "Feurzas Armadas Revolucionarias de Colombia."

Ramirez subsequently admitted the allegation in the NTA and renewed his request for asylum.

At his removal hearing, Ramirez testified that he had lived in Pereira, Colombia, and owned a small business selling shoes to stores. He also owned a farmhouse and vacation home in Apia, a small community about 38 miles outside of Pereira. He was a leader in the Apia community. He actively participated in the official Liberal Party movement, helping raise funds for community projects in Apia, such as the installation of telephones and roads, vaccinations for children, and garbage collection.

According to his testimony, in December 2000, while he was staying at his vacation home in Apia, Ramirez received a letter from FARC demanding money. The letter stated in part:

> We are aware that your properties and businesses are located in our areas of operations. Because of this, it is necessary to undertake some form of collaboration and economic agreement for the financing of the military of the people FARC-EP.
>
> By your directly communicating with us as soon as possible, you will avoid any other type of pressure. . . . The amount of tax will be agreed to between the parties. In this way you will be part of forming the New Colombia.

AR 231.

Some time after receiving this letter, Ramirez left Colombia with his wife and visited his son in the United States. While Ramirez was away, an Apia neighbor was murdered by FARC for failing to comply with a similar extortion letter. Like Ramirez,

4

he had been a landowner and leader of the Apia community.

Thereafter, Ramirez returned to Colombia (but not to Apia), and learned that FARC was engaging in a series of kidnappings in Apia. Fearing for his safety, Ramirez again left Colombia for the United States, this time without his wife. While he was away, FARC kidnapped Ramirez's son-in-law, Ricardo Megio Salgido. Megio, also a landowner, had gained prominence in his community through his coffee plantation. Megio was eventually released,[3] and Ramirez again returned to Pereira, believing that the situation had improved. He soon learned FARC had gained control of a larger portion of the country and decided to flee permanently with his wife to the United States. On January 3, 2002, just before he left Colombia for the last time, Ramirez filed a complaint with Colombian authorities about FARC's activities. After arriving in the United States, Ramirez learned another of his wife's cousins and a cousin's son had both been kidnapped. Ramirez believes that he would be killed by FARC if he returned to Colombia.

Ramirez testified that another community leader in Apia had received a similar letter from FARC. He believed FARC targeted him for "being a leader, for helping out the community and also for having the means to be able to pay." AR 115, 116. Ramirez agreed that he had money, land and the ability to pay FARC, and thus there were mixed

---

[3]On cross-examination by the government, Ramirez testified that his daughter and son-in-law, who had been kidnapped, still live and work in Colombia. However, he testified that their lives are not normal because they continue live in fear.

reasons for his being targeted by FARC. He testified that the community as a whole received generalized threats from FARC. He did not, however, testify that the community as a whole received monetary demands from that organization. Ramirez's evidence included documents stating that he had abandoned property in Apia because of FARC's demands, U.S. State Department Country Condition Reports, and reports from various human rights organizations.

## II.

The IJ denied Ramirez's application for relief, because he concluded that Ramirez had been "persecuted" by FARC for economic reasons. The BIA affirmed the IJ without opinion pursuant to 8 C.F.R. § 1003.1(e)(4).

Ramirez then filed a petition for review.[4]

We held that the IJ, and the BIA, had not addressed the "fairly raised" issue that Ramirez could also have been targeted because of his membership in a particular social group, i.e., that he was "targeted because of his status as a landowner who holds a prominent position in the community." *Ramirez v. Attorney General*, 187 Fed. Appx. 228, 230 n2.(3d Cir. 2006). We noted that although the BIA has taken the position that wealth itself does not fall within one of the enumerated grounds,[5] "there is support for

---

[4]The IJ also denied Ramirez's requests for voluntary departure and protection under the CAT. However, Vasquez did not challenge the IJ's denial of voluntary departure and protection under the CAT in his petition for review.

[5]*See In re V-T-S-*, 21 I. & N. Dec. 792, 799 (BIA 1997).

6

the proposition that certain manifestations of property holding, such as owning land, could constitute the type of immutable characteristic that would make up a particular social group under the BIA's definition of that term." *Id*. at 230-31 (citation and internal quotations omitted). We concluded that neither the IJ nor the BIA "considered the possibility that [Ramirez] could have experienced, or was likely to experience, persecution on account of his membership in a particular social group." *Id*. at 231. Thus, we commented that "[w]ithout further development of this claim, we are unable to define the precise social group for which [Ramirez] claims he was persecuted" and "we cannot decide . . . whether [Ramirez] was persecuted on account of his membership in such a group." *Id*. Accordingly, we remanded to the BIA for proceedings consistent with our opinion. *Id*.

On remand, the BIA again affirmed the IJ's denial of relief holding that Ramirez "has not established membership in a particular social group . . . or that he was targeted on account of such membership." A 27. The BIA noted that "a particular social group might be established where the members of the group had previously been landowners and were targeted because of that status. Because prior landowners are not able to change the past, status as a former landowner might be an immutable characteristic for which one could be targeted for harm." A 28. However, the BIA found that Ramirez's situation was different because "the status of being a [current] landowner is not immutable" as required by *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), because

7

"[l]and is simply one means by which a person may hold wealth." A 28. Thus, it held that "land ownership is not an immutable characteristic upon which one may construct a 'particular social group' claim for asylum or withholding of removal." A 28.

The BIA concluded that Ramirez had not established that FARC targeted him because of his land ownership or his position in the community. Rather, the BIA believed that FARC targeted everyone in the area where Ramirez had his vacation home because it wanted money to finance its anti-government cause. A 28-29.

This petition for review followed.[6]

### III.

As noted, both asylum and withholding of removal require a showing of persecution or a well-founded fear of persecution "on account of" one of five enumerated grounds: race, religion, nationality, membership in a particular social group or political opinion. In reviewing Ramirez's first petition for review, we held that he had fairly raised the issue that he was targeted "because of his status as a landowner who holds a prominent position in the community," but neither the IJ nor the BIA had addressed that claim. 187 Fed. Appx. at 230 & n.2. Thus, we were "unable to define the precise social group for which [Ramirez] claims he was persecuted," and could not

---

[6]We have jurisdiction to review a final order of removal of the BIA under 8 U.S.C. § 1252(a)(1); *Abdulai v. Ashcroft*, 239 F.3d 542, 547 (3d Cir. 2001). The BIA's factual findings are reviewed for substantial evidence, and this court reviews the BIA's legal conclusions *de novo* subject to *Chevron* deference. *Briseno-Flores v. Attorney General*, 492 F.3d 226, 228 (3d Cir. 2007).

"decide whether [Ramirez] was persecuted on account of his membership in such a group." *Id.* at 231. [7]

As we have previously observed, "[b]oth courts and commentators have struggled to define 'particular social group.'" *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993). We have also noted that, "in its broadest literal sense, the phrase is almost completely open-ended." *Id.* "Virtually any set including more than one person could be described as a 'particular social group.'" *Id.* Moreover, "the statutory language standing alone is not very instructive . . . [n]or is there any clear evidence of legislative intent." *Id.* Because of the difficulty of defining the phrase, we have deferred to the BIA's definition of a "particular social group" developed in *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled in part as stated in Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). *Id.* at 1239-40.

In *Acosta*, the BIA held that a Salvadoran taxi cooperative did not constitute a particular social group, even though the members were being persecuted because they

---

[7]It is not at all clear to us whether the BIA considered whether the particular social group could be a "landowner who holds a prominent position in the community," which was the particular social group we said Ramirez "fairly raised" in the first proceedings. *See* 187 Fed. Appx. at 230 n.2. The BIA did say that Ramirez "has not established that the FARC targeted him because of his land ownership or his status as a prominent person who owned land." A 28. The BIA also held that it "cannot find, on this record, that the FARC was specifically targeting 'landowners' or 'landowners who were leaders in the community.'" A 29. However, the precise holding of the BIA was, as noted above, that "land ownership is not an immutable characteristic upon which one may construct a 'particular social group' claim for asylum or withholding of removal." A 28. Thus, it is not at all clear that the BIA answered the question it was directed to address on remand.

9

refused to participate in work stoppages. The BIA reasoned that the characteristic of being a taxi driver was not immutable since the drivers could change jobs and the "concept of a refugee simply does not guarantee an individual a right to work in the job of his choice." 19 I. & N. 211, 234. The BIA further noted that the United Nations Protocol refers to race, religion, nationality, and political opinion, as well as membership in a particular social group. *Id*. at 232-33. Then, employing the doctrine of *ejusdem generis*, the BIA reasoned that a particular social group refers to "a group of persons all of whom share a common, immutable characteristic." *Id*. at 233. The BIA explained:

> Applying the doctrine of ejusdem generis, we interpret the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. Only when this is the case does the mere fact of group membership become something comparable to the other four grounds of persecution under the Act, namely, something that either is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed. By construing "persecution on account of membership in a particular social group" in this manner, we preserve the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution.

*Id*. at 233-34.

In *Fatin*, we noted that, as mentioned in *Acosta*, "sex" is a shared characteristic

10

that could link the members of a "particular social group." 12 F.3d at 1240. In a later case, *Lukwago v. Ashcroft*, 329 F.3d 157 (3d Cir. 2003), we held that former child soldiers who have escaped captivity by the Lord's Resistance Army, a rebel group that opposes the Ugandan government, constitute a "particular social group." *Id*. at 178. We observed that Lukwago "shares the past experience of abduction, torture and escape with other former child soldiers. His status as a former child soldier is a characteristic he cannot change and one that is now, unfortunately, fundamental to his identity." *Id.*

However, in *Escobar v. Gonzales*, 417 F.3d 363 (3d Cir. 2005), we held that homeless Honduran street children are not a particular social group who can seek asylum and withholding of removal based on their persecution in Honduras. We noted that *Acosta* and other cases

> lead to the conclusion that membership in a "particular social group" can
> be attributed to either: (1) those who possess immutable characteristics
> such as race, gender or a prior position, status or condition; or (2) those
> who possess a characteristic that is capable of being changed but is of such
> fundamental importance that individuals should not be required to modify
> it, e.g., religion.

417 F.3d at 367. We then noted that "the social group must exist as such and persecution must be on account of a protected ground, but the persecution cannot be what defines the contours of the group." *Id*. (citation omitted). Thus, we commented that "[p]ast persecution of itself does not define the group. Nor is youth alone a sufficient permanent characteristic, disappearing as it does with age." *Id*. (citation omitted).

We concluded that "a legitimate distinction cannot be made between groups of

11

impoverished children who exist in almost every country." *Id*. Thus, we held that the claimed social group was "almost completely open-ended" which "counsels against a designation that would appear to be contrary to congressional intent." *Id*. at 368.

Here, the BIA held that the "status of being a current landowner is not immutable. Land is simply one means by which a person may hold wealth." A 28. However, in a decision rendered after *Acosta*, the BIA has retreated somewhat from its earlier holding that wealth, standing alone, precludes a finding of membership in a particular social group. *See* n.4, *supra.* In *In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69 (BIA 2007),[8] the BIA reaffirmed its earlier holding that wealth is not an immutable characteristic. *Id*. at 73. However, it also recognized that it is not dispositive of what constitutes a particular social group. Where wealth is "so fundamental to identity or conscience that it should not be expected to change," the BIA has recognized the possibility that wealthy persons could constitute a particular social group. *Id*.; *see also Romero v. Mukasey*, 262 Fed. Appx. 328, 330 (2d Cir. 2008). Here, the BIA did not make in inquiry into whether landownership in Colombia is so fundamental to the identity or conscience of Vasquez and all other landowners like him, that they should not be expected to change.

In addition, the BIA here commented that it was unfortunate that a person had to sell, give away or abandon land in order to avoid harm, but likened that to a person having to abandon his job to avoid harm as was the situation in *Matter of Acosta*. A 28.

---

[8]In which the BIA held that affluent Guatemalans are not a particular social group.

12

However, the BIA's suggestion that all Vasquez had to do to avoid harm at the hands of FARC was to get rid of his land, runs counter to the BIA's holding in *In re A-M-E*, that where wealth is so fundamental to identity or conscience that it should not be expected to be changed, "we would not expect divestiture when considering wealth as a characteristic on which a social group might be based." 24 I. & N. Dec. at 73-74.

Finally, in *In re A-M-E*, the BIA further explained that in order to constitute a particular social group, a proposed group must (1) exhibit a shared characteristic that is socially visible to others in the community, and (2) be defined with sufficient particularity. *Id*. at 74-76; *see also In re C-A-*, 23 I. & N. Dec. 951 (BIA 2006) (holding that social visibility of the members of a claimed social group is an important consideration in identifying the existence of a particular social group for the purpose of determining whether a person qualifies as a refugee).[9]

In sum, it is conceivable that the BIA, in holding that landownership is not an immutable characteristic upon which to construct a particular social group, may have committed three errors. First, as stated in n.7, *supra*, the BIA may not have answered the question it was directed to answer on remand. Second, the BIA may have erred by not inquiring into whether landownership in Colombia is so fundamental to the identity or

---

[9]In *In re C-A-*, the BIA held that the group of "former noncriminal drug informants working against the CALI drug cartel" does not have the requisite social visibility to constitute a particular social group. *In re C-A-* was affirmed *sub nom. Castillo-Arias v. Att'y General*, 446 F.3d 1190 (11th Cir. 2006).

conscience of Vasquez and similarly situated landowners, that they should not be expected to change or divest their land. Third, should landownership be so fundamental to Ramirez and other landowners like him, the BIA may have erred in finding that all Ramirez had to do to avoid harm was divest himself of his land.

However, we believe that any of these potential errors would be harmless. Although it held that Ramirez was unable to construct a particular social group based on landownership, the BIA also held that Ramirez "has not established that the FARC targeted him because of his land ownership or his status as a prominent person who owned land." A 28. Rather, the BIA concluded that FARC targeted everyone in the area where Ramirez had his vacation home because it wanted money to finance its cause. Therefore, the BIA held that Ramirez has not established past persecution or a well-founded fear of future persecution on account of his membership in a particular social group.

Ramirez argues that the record compels the finding that he suffered past persecution – a death threat which caused him to abandon his homeland, on account of membership in a particular social group. Ramirez posits that the letter he received from FARC was a death threat. He contends he received the death threat because of his involvement in the community and his ability to pay because he was a landowner.

However, we do not believe that Ramirez has demonstrated past persecution. His only contact with FARC was the one letter. It was extortionate, but Ramirez testified that

14

he was never otherwise threatened by FARC. Indeed, the fact that the Ramirez's remained safely in Colombia after receiving the letter clearly supports the BIA's finding of no past persecution. Indeed, because Ramirez voluntarily returned at least twice to Colombia, he demonstrated that he is not a refugee. He is neither unable nor unwilling to return; he did in fact, return. *See Toloza-Jimenez v. Gonzales*, 457 F.3d 155, 161 (1st Cir. 2006) (holding that the fact that Toloza "traveled twice to the United States . . . and yet she returned to Colombia each time, strongly indicat[ed] that she has no fear of persecution.").

Therefore, even if the BIA erred in its social group analysis, Ramirez's petition for review must be denied because he did not demonstrate past persecution. Ramirez does not argue that he has a well-founded fear of future persecution.

## IV.

For the above reasons, we will deny the petition for review.